948 A.2d 717 (2008)
400 N.J. Super. 581
STATE of New Jersey, Plaintiff-Respondent,
v.
Jacob BURNO-TAYLOR, Defendant-Appellant.
Docket No. A-0265-07T4
Superior Court of New Jersey, Appellate Division.
Argued February 14, 2008.
Decided June 19, 2008.
*719 Joshua D. Sanders, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, *720 attorney; Mr. Sanders, of counsel and on the brief).
Leonardo Rinaldi, Assistant Hudson County Prosecutor, argued the cause for respondent (Edward J. De Fazio, Prosecutor, attorney; Mr. Rinaldi, on the brief).
Before Judges WEFING, R.B. COLEMAN and LYONS.
The opinion of the court was delivered by
WEFING, P.J.A.D.
A grand jury returned a seven-count indictment against defendant, charging him with murder, N.J.S.A. 2C:11-3(a)(1),(2); felony murder, N.J.S.A. 2C:11-3(a)(3); first-degree robbery, N.J.S.A. 2C:15-1; theft, N.J.S.A. 2C:20-3; burglary while armed, N.J.S.A. 2C:18-2; unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d). Defendant filed a motion seeking to suppress a statement he gave to the police. The State does not dispute defendant's assertion that it has no other evidence to place him at the scene of the homicide other than this statement. After conducting several days of hearings, the trial court concluded that defendant had voluntarily waived his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We granted defendant's motion for leave to appeal. After reviewing the record in light of the contentions advanced on appeal, we reverse the trial court's order.
Defendant raises two arguments on appeal:
POINT I THE TRIAL COURT'S DENIAL OF BURNO-TAYLOR'S MOTION TO SUPPRESS THE DECEMBER 20, 2005 STATEMENT WAS BASED UPON ERRONEOUS FINDINGS OF FACT AND MISAPPLICATION OF CONTROLLING FEDERAL AND STATE LAW WHEN IT RULED THAT THE STATE DID NOT VIOLATE THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND THE CONCOMITANT COMMON LAW RIGHT UNDER STATE V. HARTLEY BY FAILING TO SCRUPULOUSLY HONOR BURNO-TAYLOR'S INVOCATION OF HIS PROTECTION FROM SELF-INCRIMINATION
A. The Trial Court Erred In Determining That Burno-Taylor Never Invoked His Right To Remain Silent
B. The Trial Court Erred In Linking Burno-Taylor's Rights To Remain Silent and His Right To Counsel
C. The Trial Court Erred In Determining That Law Enforcement Never Made Any Untrue Statements, Threats, or Misleading or False Promises
POINT II THE "INTERROGATION: ADVICE OF RIGHTS" FORM USED IN THIS CASE IS PER SE UNCONSTITUTIONAL AS IT REQUIRES DECLARANTS TO SIMULTANEOUSLY ACKNOWLEDGE AND WAIVE THEIR RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND NEW JERSEY'S COMMON-LAW PRIVILEGE AGAINST SELF-INCRIMINATION

I
Before analyzing the facts of the instant matter, we set forth the legal principles which must guide our analysis of these facts. In Miranda v. Arizona, our United States Supreme Court set forth the rule that "the prosecution may not use statements, whether exculpatory or inculpatory, *721 stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706. It held that a statement taken in the absence of those procedural safeguards could not "truly be the product of [a defendant's] free choice." Id. at 458, 86 S.Ct. at 1619, 16 L.Ed.2d at 714.
Thus, prior to any custodial interrogation, an individual must be informed of his right to remain silent. Id. at 467-68, 86 S.Ct. at 1624, 16 L.Ed.2d at 720. This warning is "an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere," because it dispels the idea "that the interrogation will continue until a confession is obtained or that silence in the face of accusation is itself damning." Id. at 468, 86 S.Ct. at 1624, 16 L.Ed.2d at 720. This warning is designed "to insure that the individual knows he is free to exercise the privilege at that point in time." Id. at 469, 86 S.Ct. at 1625, 16 L.Ed.2d at 720.
In addition, to assure that the individual understands and can make an intelligent choice whether to exercise the privilege, the individual must also be told "that anything said can and will be used against the individual in court." Id. at 469, 86 S.Ct. at 1625, 16 L.Ed.2d at 720-21. It is only upon being advised of the Miranda rights that an individual may make a reasonable decision whether to proceed. A decision to proceed, however, is not irrevocable.
If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.
[Id. at 473-74, 86 S.Ct. at 1627-28, 16 L.Ed.2d at 723 (footnote omitted).]
An individual may, of course, waive the privilege against self-incrimination, but the prosecution must show that the waiver was made "voluntarily, knowingly and intelligently." Id. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707.
[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation.
[Id. at 476, 86 S.Ct. at 1629, l6 L.Ed.2d at 725.]

II
Although New Jersey's constitution does not contain an explicit statement of the privilege against self-incrimination, our courts have long recognized it as being subsumed within our constitution's guarantee of due process. "New Jersey's privilege against self-incrimination is so venerated and deeply rooted in this state's common law that it has been deemed unnecessary to include the privilege in our State Constitution." State v. O'Neill, 193 N.J. 148, 176, 936 A.2d 438 (2007). New Jersey's privilege is "treated . . . as though it were of constitutional magnitude," and it is informed by the principles *722 contained in Miranda. Id. at 168-69, 176-77, 936 A.2d 438. Indeed, our courts have interpreted our privilege as "offer[ing] broader protection than its Fifth Amendment federal counterpart." Id. at 176-77, 936 A.2d 438. Before a confession can be admitted into evidence against a defendant, the State must prove that it was made voluntarily, knowingly and intelligently. As a matter of state law, the prosecution must carry its burden in this regard beyond a reasonable doubt. State v. Burris, 145 N.J. 509, 534, 679 A.2d 121 (1996); State v. Gerald, 113 N.J. 40, 118, 549 A.2d 792 (1988).
In State v. Hartley, our Supreme Court addressed the question whether law enforcement had "scrupulously honored" an individual's right to remain silent. 103 N.J. 252, 255-56, 511 A.2d 80 (1986). The defendant in that case was given his Miranda warnings both at the time of his arrest and in an interview room, where he was presented with a form containing the Miranda warnings and waiver language almost identical to the waiver language on the form in this matter. Id. at 258, 511 A.2d 80. And, like the present matter, the signature line was located under the waiver language. Ibid. Thus, as the Hartley Court noted, "the only purpose of the signature was not to acknowledge receipt of one's rights but, rather, to indicate a waiver of those rights." Ibid. Hartley reviewed the form and said he understood it. He hesitated and when asked what the problem was, responded, "I don't believe I want to make a statement at this time." Ibid. The officer replied, "Fine. If you don't want to make a statement at this time, strike that particular item and initial it." Ibid. Hartley did so; he was fingerprinted and photographed but not questioned. Ibid.
A few hours later, however, the officer returned and asked the defendant to reconsider, saying "[N]ow is the time if you are going to make a statement. Now is the time to do it." Ibid. Hartley responded, "What do you want to know?" Id. at 259, 511 A.2d 80. The officer proceeded to question the defendant, who ultimately gave a confession. Ibid. He would not, however, sign a typed statement. Ibid.
The defendant was again questioned at a later point and again advised of his Miranda rights. Ibid. He again refused to sign a typed statement and would not agree to be tape-recorded. At trial, his oral statements were held admissible as evidence against him. Ibid.
Our Supreme Court, however, reversed. It commenced its analysis by noting the distinction between scrupulously honoring the right to remain silent and an individual's waiver of that right. The question whether an individual has waived the right to remain silent cannot be addressed, the Court stated, without first determining "whether the defendant's right to remain silent has been properly respected in the first instance." Id. at 260, 511 A.2d 80. The Court noted that the Miranda Court had "made clear that the requirement that the police `scrupulously honor' the suspect's assertion of his right to remain silent is independent of the requirement that any waiver be knowing, intelligent, and voluntary." Id. at 261, 511 A.2d 80. It is critical that the questions be analyzed separately. When the police fail to scrupulously honor the right to remain silent, that failure "renders unconstitutionally compelled any resultant incriminating statement made in response to custodial interrogation [and] there can be no question of waiver." Ibid. The Hartley Court concluded after reviewing the chronology and the context that the officer's conduct had been "coercive" and that the officer had not scrupulously honored the defendant's assertion of his right to *723 remain silent. Id. at 267-71, 511 A.2d 80. The Court, therefore, held that any statements made by the defendant were "involuntary by definition" and inadmissible at his trial. Id. at 278, 511 A.2d 80.
A person can assert the right to remain silent by "indicat[ing] in any manner, at any time prior to or during questioning, that he wishes to remain silent." Miranda, supra, 384 U.S. at 473-74, 86 S.Ct. at 1627, 16 L.Ed.2d at 723. New Jersey courts have recognized that even an ambiguous indication of a desire to remain silent is sufficient to require that questioning cease. State v. Johnson, 120 N.J. 263, 281-82, 576 A.2d 834 (1990); State v. Bey, 112 N.J. 45, 64-65, 548 A.2d 846 (1988) ("Bey I") ("a request to terminate an interrogation must be honored `however ambiguous'") (quoting State v. Kennedy, 97 N.J. 278, 288, 478 A.2d 723 (1984)). If the police are reasonably uncertain whether the person is asserting the right to remain silent, they may only ask questions directed to resolving that uncertainty. Johnson, supra, 120 N.J. at 283, 576 A.2d 834.
On the other hand, the police may continue their questioning so long as the person's words or conduct could not reasonably be viewed as invoking the right to remain silent. State v. Bey, 112 N.J. 123, 136-38, 548 A.2d 887 (1988) ("Bey II"). In Bey II, the defendant had been interrogated for two to three hours when he said he "wanted to lie down so that he could think about what happened." Id. at 133, 548 A.2d 887. The Court concluded that defendant's statement, given the circumstances, could not reasonably be viewed as an assertion of the right to remain silent. Id. at 141-42, 548 A.2d 887. It stated:
Defendant merely communicated his desire to spend some time thinking about the events that were the subject of the interrogation. He did not ask for an attorney or refuse to sign a waiver of his rights. Similarly, he did not refuse to continue the questioning, and did not indicate in any manner that he wanted to end the interrogation.

[Id. at 138, 548 A.2d 887 (emphasis added).]

III
We turn now to the record before us. Defendant was charged with the killing of Sonja Svenson, who was found stabbed to death in her Bayonne apartment on December 18, 2005, by defendant's mother and sister. Detectives from the Hudson County Prosecutor's Office noted that her jewelry box was open and that her dresser drawers had been opened and the contents dumped on her bed.
For reasons that are not apparent from the record before us, the initial investigation by detectives from the prosecutor's office led them to consider defendant a "person of interest" in connection with this homicide. On December 20, 2005, detectives from the prosecutor's office learned that defendant was being held in the Hudson County Administration Building, where he was waiting to appear before the trial court. Defendant was in custody because he had been arrested by Bayonne police on December 18 on unrelated charges of possession of narcotics and contempt of court; this arrest led to defendant being charged with violating the terms of his probation. The record before us does not reveal the underlying offense which resulted in defendant receiving a probationary sentence. Before defendant appeared before the trial court on the charge of violating his probation, however, a detective from the prosecutor's office went to the Administration Building and brought defendant to the office of the prosecutor's homicide unit, located in a *724 separate building approximately two miles away from the Administration Building.
When they arrived, defendant was placed in a small, windowless interrogation room. Defendant had been handcuffed during the trip from the Administration Building, but once in the interrogation room, the handcuffs were removed. Defendant was initially questioned by Detectives Jeffery and Pastrana of the prosecutor's office. This interrogation room is equipped with video and audio recording systems and defendant's entire interrogation was recorded. We have been supplied with both a copy of the videotape of the interrogation and a transcript in connection with this appeal, and we have reviewed both several times in our consideration of the merits of this appeal. We will set forth extensive portions of that interrogation during the course of this opinion.
Early on, Detective Jeffery told defendant he was going to read to him his Miranda rights. Defendant asked if he were being charged with something and Detective Jeffery said no. He explained to defendant that he was reading his rights because defendant was "already under arrest," presumably referring to the charge of violating probation. Detective Pastrana said to defendant it was "just a formality," and Detective Jeffery echoed that thought, saying, "Formality that's all it is. It's nothing okay?"
Detective Jeffery then read defendant his Miranda rights, and defendant indicated that he understood them. Detective Jeffery then asked, "You ah you want to talk to us?" and handed a waiver form to defendant for his signature. The form was headed "Interrogation: Advice Of Rights," and contained the following language:
Your Rights
Before we ask you any question, you must understand your rights.
1. You have the right to remain silent.
2. Anything you say can and will be used against you in a court of law.
3. You have the right to talk to a lawyer for advice before you ask we ask you [sic] any questions, and to have him/her with you during questioning.
4. If you cannot afford a lawyer, one will be appointed for you, before any questioning. If you wish [sic].
5. If you decide to answer questions now, without a lawyer present [sic]. You will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.
WAIVER OF RIGHTS
I HAVE READ THIS STATEMENT OF MY RIGHTS, AND UNDERSTAND WHAT MY RIGHTS ARE. I AM WILLING TO MAKE A STATEMENT AND ANSWER QUESTIONS. I DO NOT WANT A LAWYER AT THIS TIME. I HAVE UNDERSTAND [sic] AND KNOW WHAT I AM DOING. NO PROMISES OR THREATS HAVE BEEN MADE TO ME AND NO PRESSURE OR COERCION OF ANY KIND HAS BEEN USED AGAINST ME.
Near the top of the form were lines for the interviewing officer to enter the place, date, and time. At the bottom, below the "waiver of rights" clause, were signature lines for the person being interviewed and for two witnesses, as well as a line to record the time at which the form was signed.
Defendant spent a little more than a minute reading the waiver form. Detective Jeffery asked, "You ah, you gonna sign it?" Defendant replied, "Uh-uh." When asked why not, defendant replied, *725 "This says I am willing to make this statement and answer questions," referring to the second sentence in the waiver of rights clause. The two detectives tried to reassure defendant that he was not being charged with anything. Defendant said, "It's got `interrogation' up there," referring to the title on the form. Detective Pastrana told defendant that "interrogation" just meant asking him questions.
For the next twenty-two minutes, defendant resisted signing the form. Including the initial refusal we just noted, he indicated a total of eleven times that he would not sign the form. He also clearly indicated that he did not want to talk to the detectives. After refusing for the fourth time to sign the form, Detective Jeffery asked, "You want to talk to us though?" Defendant answered, "Uh-uh." The conversation continued:
Q: Why not?
A: I want to know what you wanna talk about?
Q: Well we can't tell you till you say you'll, you agree to talk to us.
A: I ain't going to sign.
Q: Will you agree to talk to us?
A: About what?
Q: Once, once we get rid of this silly piece of paper we're on our way.
A: I ain't gonna sign it.
Q: Will you talk to us?
A: I'm not gonna sign it.
Q: Okay. Will you talk to us?
A: You just said I got to sign this to talk to you.
Q: No, you, you, you really don't have to sign it but you can talk to us.
A: What do you want to talk about?
The detectives persisted in their attempts to persuade defendant to talk to them and answer their questions. They continued to ask if he were willing to talk to them; defendant inquired several times what they wanted to talk to him about; they responded they would tell him if he agreed to talk to them. On that basis, defendant finally agreed to talk to the detectives but he persisted in his refusal to sign the waiver form.
When the detectives nonetheless continued to seek to have defendant sign the form, defendant said he did not want to talk to the detectives at all. At that point, the following colloquy occurred:
Q: (Det. Jeffery): We're going to talk to you. Had you not been in Kearny [presumably a reference to the Hudson County Correctional Facility] we probably wouldn't have to read these things.
Q: (Det. Pastrana): See being that you're locked up we have to read you your rights.
Q: (Det. Jeffery): That's it.
Q: (Det. Pastrana): But if you were still on, on, by, Bayonne we would have scooped you up on Bidwell we would have scooped you up and we didn't have to go through this. Believe me we were gonna scoop you up until you were arrested Bayonne Sunday.
A: For what though?
Q: Well.
Q: (Det. Jeffery): You gonna talk? Yes or no. We need you to say yes. If you say yes I write refuse to sign and that's it and we talk, we just, we just go our way, you know.
A: I still go to court though, right?
Q: For what?
A: I don't go to court today?
Q: (Det. Pastrana): Yeah.
Q: (Det. Jeffery): Today you got to . . .
Q: (Det. Pastrana): I think so.

*726 Q: (Det. Jeffery): That thing going on.
Q: (Det. Pastrana): Judge Callahan, right?
Q: (Det. Jeffery): Did you see the Judge yet?
A: No.
Q: Then you probably go to Court. You gonna talk? Why not?
A: Cause.
Q: Why don't you want to talk to us?
A: I want to know what you want to talk about. I don't really have anything to talk about.
Q: Why not?
A: I don't know.
Q: Let's make believe we're just regular guys.
A: I don't really want to talk to you.
Q: We've talked to your mom, we've talked to Sharleese. We've talked to ah, Tracey,[1] we've talked to Mike Williams, who's your uncle.
At that point, a sergeant from the prosecutor's office entered the interrogation room and joined the conversation.
Q: (Sgt. Kolich): All right, let me explain what is going on, okay. I understand that you got arrested by Bayonne Police.
A: Um-hm.
Q: Okay we don't want to talk to you about that.
A: Yeah.
Q: Okay so anything we talk about got nothing to do with that arrest, all right. We're investigating a homicide.
A: Uh-huh.
Q: And we have information that you, that you may be able to help us with our homicide and that's what we want to talk to you about. Just like anybody else we bring in here we want to talk to we read them their rights. It's just a formality. On the rights it says at anytime you want to stop talking you can stop talking to us. Okay? But we can't begin the conversation till you agree to talk to us and we start going. Anytime you feel uncomfortable you say listen, I don't want to talk anymore and it ends. You understand? Okay? We're asking you to help us out. All right, we're not charging you with anything? We're not going to talk to you [about] anything related to the other crime. This is just to help us out with a homicide investigation. Fair enough?
A: My mother still locked up?
Q: (Det. Pastrana): No, I got her released.
Q: (Det. Jeffery): We took care of your mother, like, like, like she was our relatives [sic].
After explaining that the detectives had arranged to have defendant's mother released on her own recognizance (the record does not reveal why she was being held), the conversation continued.
Q: (Sgt. Kolich): My guys read this to you right? Did you get a chance to read it? And you said, it says right here, um, if you decide to answer questions now without a lawyer present you'll still have the right to stop answering at anytime. You also have the right to stop answering at anytime until you talk to a lawyer. Do you understand what that says? Yes or no.
A: Um-hm.
Q: When you shake your head I don't know what that means, that's why.
A: Yeah, I know what it means.

*727 Q: Okay. So that's why, now, they read each one of these and you, you understood each one of these?
A: Yeah.
Q: Okay, see, see we're not trying to trick you. We're being straight up front with you. We need your help in a homicide investigation and that's why we're asking you to talk to us, simple as that. Is that fair enough? So if you can sign that. . . .
A: I'm still not going to sign that.
Q: Why not?
A: Cause I'm being interrogated by you.
Q: Listen to me, okay. There's no interrogation going on it's a question. All right, this is a formality that we do and I'm sure you've seen it on T.V. hundreds of times. When they talk to people they read them their rights. You're not being charged . . .
Q: (Det. Pastrana): You're being interviewed.
Q: (Sgt. Kolich): You're not being charged by us with a crime. You've got something to hide here?
A: No.
Q: Then why won't you want to talk to us if you got nothing to hide?
A: Because man, y'all just snatched me up.
Q: How did we snatch you up when you were in Court? Do you understand why we snatched you up? Because we have, your name came up in a homicide investigation and you may be able to help us. So yeah, are we gonna snatch you up, we're gonnna snatch up anybody that can help us. Right? Doesn't that make sense?
A: I don't know.
Q: (Det. Jeffery): You just happened to be in court.
A: How can I help y'all?
Q: (Sgt. Kolich): If we were, if we were going to trick you would we read you this and tell you, you can stop us at any, stop talking at anytime? We're putting it right out in front of you, being right up front saying this is your rights and this is why we want to talk to you. We're not trying to trick you. Now, I looked at your rap sheet you've been arrested before, right? And every time you were arrested you were given your rights, weren't you? So you know what the system is about. We're not trying to trick you we're being right up front with you. I would think if it was a homicide investigation you'd want to help out.
A: Hell no.
Faced with defendant's continued unwillingness to sign the waiver form, the sergeant tried another tack.
Q: Do you understand you're not here under arrest for anything (inaudible). You're under arrest because of Bayonne. They locked you up . . .
A: I know.
Q: for possession I believe, right.
A: Yeah.
Q: Okay that's what you were arrested for. We don't want to talk to you about that. We don't care about that. Don't care about that. In fact maybe some of the information you give us we may be able to help you with that charge. But I don't know until you talk to us. You know one hand may be able to help the other here. And I understand the person that's involved in this may be a family friend of yours.

*728 A: In what?
Q: And that's why we want to talk to you about this.
A: (Mumbles.)
Q: All right the victim in this may be a family friend of your family and that's why we want to talk to you about this. I'm just trying to be straight and fair with you. I've never seen anybody give us this much (inaudible) this much trouble trying to sign this and talk to us.
A: No but like um, I ain't no snitch. . . .
Q: Listen, look at me, look at me right now. First of all, first of all what were you arrested what [sic] narcotics and bullshit stuff. You're in the big leagues now, this is homicide. Okay? It's not about snitching.
A: How, how I'm in the big league?
Q: It's not, it's not, no this investigation is about a homicide. This is the big leagues. It's not about snitching right now. It's about trying to do the right thing for an innocent victim.
A: Yeah I don't know what's going on.
Q: I know that and the only way we can talk to you is if you sign this and say okay and then if it reaches a point where you feel uncomfortable you say I don't want to talk anymore.
A: I feel uncomfortable right now.
Q: Why? Are you getting accused of anything?
A: No.
Q: So why does it make you uncomfortable?
Q: (Det. Pastrana): You guilty or something?
A: No.
Q: You hiding something?
A: Why I just don't know why my sisters put my name in it.
Q: (Sgt. Kolich): That's what, listen to me. Okay, we understand, I'm gonna be straight up with it. That the victim in this is a friend of your family's.
A: Yes, she is.
Q: And that's why, you know who the victim is?
A: Ah, (inaudible). That was some lady my mother used to clean up for.
Q: Okay. Okay, so we want to talk to you about her. Do you have something to hide on that?
A: No.
Q: Then why don't you want to talk to us?
A: Just like. . . .
Q: (Det. Pastrana): Shows that you do now.
Q: (Sgt. Kolich): To me it sounds like you do.
Q: (Det. Pastrana): Then when we pick you up the next time it's not going to be.
A: She was just somebody that my mother cleaned up for.
Q: All right. That's why we wanted you to sign the papers so that we could talk to you and ask you questions.
Q: (Det. Jeffery): It's a friend of your mother's. As a matter of fact, your mother was in tears yesterday. Like she went through a whole roll of this stuff because of what happened.
Q: (Det. Pastrana): Why you afraid talking about us like that?
Q: (Det. Jeffery): You know . . .
A: I'm not.
Q: and we did the right thing by your mother. We bought her lunch. I let her smoke some cigarettes in a non-smoking building. Help us out man.
A: Y'all had her in Bayonne?
Q: (Det. Pastrana): Yes . . .

*729 Q: (Det. Jeffery): Had her in Bayonne and you know they don't let you smoke in that building.
Q: (Det. Pastrana): You talk to her yesterday?
A: No.
Q: (Sgt. Kolich): Your family's very upset about this and we're trying to do the right thing for your family by helping (inaudible).
* * * *
Q: But you, you sound like you're afraid of something.
Q: (Det. Jeffery): It's just talking.
Q: (Sgt. Kolich): And I don't know what you're afraid of.
Q: (Det. Pastrana): See now you make it harder on yourself.
A: No, I'm not making it harder on myself.
Q: (Det. Jeffery): It's, it's just talking that's all we're going to do is just talk.
Q: (Sgt. Kolich): Let me ask you a question. What is your biggest concern right now? That you don't want to sign this, why?
A: Don't got no concerns, I'm just trying to get back out on the streets.
Q: All right but listen to me. Again, the victim in this is a family friend of yours.
A: She ain't, she not really a family friend. She's just a lady that my mother used to clean up for.
Q: Okay. Well, it was enough that your mother was very upset about her death. And I would think that if your mother is that close to somebody that you would want to help out.
A: That don't mean I was close to her. Or anybody else. My sisters didn't never talk to her like that.
Q: Listen to me I understand that, okay. But we have some specific questions that we want to ask you, all right. But until you sign that we can't ask them, right. And to me that's so silly cause it's almost like you're trying to hide something but yet what do you have to hide?
A: You keep saying that but I don't got to hide nothing all right.
Q: All right then . . .
Q: (Det. Pastrana): Clear your name.
A: (Inaudible.)
Q: (Det. Jeffery): Clear your name and we're on our way.
Q: (Det. Pastrana): Clear your name so we can get going.
Q: (Det. Jeffery): And we're on our way. That's it.
Q: (Det. Pastrana): Stop the dancing here and let's go with the paper.
A: I ain't dancing.
The conversation then turned to the charges defendant faced.
Q: (Det. Jeffery): You got a bail?
A: Yep.
Q: (Det. Pastrana): What?
Q: (Det. Jeffery): What's your bail?
A: A thousand.
Q: It's a thousand?
A: Yep.
Q: (Det. Pastrana): Ten percent?
A: Yeah. No it's only (inaudible) ten percent.
Q: Well maybe we'll rid of the ten percent for you.
Q: (Sgt. Kolich): So listen, let me understand this.
A: You make it hard on me.
Q: (Det. Pastrana): You're gonna make it harder on yourself. You want to play ball or you want to be like this or we can do the same to you.
Q: We can help you or we can just make it hard on you.

*730 A: (Inaudible) hard on me ain't like I'm gonna do no jail or nuttin'.
Q: (Sgt. Kolich): You're so sure of that. You're so sure of that. That, that you got jammed up for two bags and then you got busted on Sunday.
A: I ain't sayin' like they gonna release me today or nothin'.
Q: (Det. Pastrana): I'll tell you what though. Think about Christmas and New Year's if you're inside the can.
* * * *
Q: (Det. Jeffery): Let's get this over with, man.
Q: (Sgt. Kolich): I never seen a guy drag this out like this.
Q: (Det. Pastrana): I say, when you're drag [sic] something like that you're hiding something now.
Q: (Sgt. Kolich): I agree.
Q: (Det. Pastrana): You're as fucking guilty as whatever can be on something cause you're holding back.
Q: (Det. Jeffery): I don't know if he's guilty. I don't know that.
A: (Inaudible) I just ain't signing the paper.
Q: (Inaudible) you, you'll agree to talk to us?
Q: (Sgt. Kolich): Listen here's what we'll do, all right. I'll let my guys write down refuse on there that you don't, you didn't want to sign the form but that you still wanted to talk. Is that fair?
A: Nope.
Q: Okay, what do you, what do you want to do? You want to go back to the County?
A: I want to go to, to, to um, Court so I can see, see what's going on with my case.
Q: (Det. Jeffery): Oh, we're gonna have to do something for you.
A: No, I didn't say y'all.
Q: (Sgt. Kolich): Why don't we just go back and tell the judge that he's a witness in a homicide and he's being uncooperative.
Q: (Det. Pastrana): That's what I'm gonna do right now. I'm just gonna make a phone call.
Q: (Det. Jeffery): Hold up let's talk.
Q: (Det. Pastrana): No, fuck that.
Q: (Det. Jeffery): Talk to him for a minute.
Q: (Sgt. Kolich): We're trying to make the guy a deal here . . .
Q: (Det. Jeffery): What we'll talk.
Q: (Det. Pastrana): Why? He's just gonna sing and dance with us that's bullshit.
Q: (Det. Jeffery): (Inaudible.)
Q: (Det. Pastrana): Let's call up the judge and tell him listen and then push the calendar back and I don't give a fuck. I got, I got, I'm off for the holidays. You want to play hardball I can play. You want to talk we can sit down and talk.
Q: (Det. Jeffery): We'll sit down and talk or you want him to go make a phone call. I mean you know.
Q: (Sgt. Kolich): Listen to me. I'm gonna apologize . . .
Q: (Det. Pastrana): I'm gonna guarantee you one thing from here though, excuse me, Sergeant. Once we leave here you won't go to the Co  we, we, we'll bring you right back to the County. I'll make it that, not that much hard on you, all right. I'm just here to tell you. You want to be a ball buster I'll be a ball buster.
Q: (Sgt. Kolich): We just want to, listen, we just want to talk to a friend of your mother's.

*731 Q: (Det. Jeffery): Friend of your mom's.
Q: (Sgt. Kolich): Do the right thing.
Q: (Det. Jeffery): Friend of your mom's, that's it man.
Q: (Sgt. Kolich): You know this family got to bury their mother right before Christmas.
A: What?
Q: This family has to bury their mother right before Christmas. This girl, this woman that died, right?
A: Yeah.
Q: And you can't help them out?
A: I don't know nothing.
Q: Listen to me. You don't know the questions we're gonna ask, do you?
Q: (Det. Jeffery): We're gonna ask certain things.
Q: (Sgt. Kolich): And that's why we want to talk to you.
Q: (Det. Jeffery): And that's it. Certain things.
Q: (Sgt. Kolich): How old are you?
A: Nineteen
Q: Nineteen, right?
A: Yeah.
Q: So you, I mean, so, it's not like you're dumb and don't understand what's going on. You understand fully what's going on here, right?
A: Yeah.
Q: So why you being evasive?
A: Cause man.
Q: Like what?
A: Cause.
Q: (Det. Jeffery): Because why? Are we being hard guys?
A: No, you ain't being hard on me but.
Q: But what?
A: I don't really have anything to talk about.
Q: (Sgt. Kolich): Well, answer our questions.
Q: (Det. Jeffery): Answer our questions and then you're on your way. That's it.
A: Hmm. Pshew. Yall sure know how to fuck people.
Q: Who's fucking people?
A: Your partner. The Sarge.
Q: Sarge?
Q: (Sgt. Kolich): How I'm fucking you?
A: Talking about calling the judge up this and that.
Q: I'm being honest. . . .
Q: (Det. Jeffery): (Inaudible.)
Q: (Sgt. Kolich): That's being honest with you.
Q: (Det. Jeffery): That's being honest man.
Q: (Sgt. Kolich): That's being honest with you.
Q: (Det. Jeffery): Ain't no one fucking you.
Q: (Sgt. Kolich): Cause I want the judge to take, take everything to consideration when he makes his judgment. And I could go up there and say, Judge, this guy was very cooperative with a homicide investigation. This guy was stone cold during it. What do you want me to tell him? I'll tell him whatever you want. You want me to tell him you cooperated? Glad to do that. Then answer our questions.
A: He my boy right here.
Q: (Det. Jeffery): What do you got? Get rid of the formality man? We'll take care of business, we're on our way.
Q: (Sgt. Kolich): We're not charging you with anything.
A: I'm not hiding nothing.
Q: (Det. Jeffery): I'll let you smoke.

*732 A: Yeah, I, I, I need a cigarette.
Q: Sign first.
A: Sign first?
Q: You gave it to us I know.
Q: (Sgt. Kolich): We'll get you a cigarette I can do that.
Q: (Det. Jeffery): Newport right? I'll see what I can do to hook one up. I'll go, I'll go get one.
At that point, promised a cigarette, defendant finally signed the waiver form.
According to the executed form, the detectives informed defendant of his Miranda rights and initially asked him to sign the waiver form at 11:50 a.m. Defendant did not sign the form until nearly one-half hour later, at 12:18 p.m., after repeatedly telling the detectives he did not want to talk to them and did not want to sign the form.
He proceeded to tell the detectives that he had, indeed, gone to the victim's apartment but that when he arrived, he found her stabbed to death. He admitted that he pilfered several items and then left. Defendant was subsequently indicted for the killing and moved to suppress this statement as having been taken in violation of his Miranda rights.

IV
Here, in contrast to the situation in Bey II, supra, defendant refused on eleven separate occasions to sign a waiver of his rights. We recognize that defendant's refusal to sign a waiver form does not necessarily equate to an assertion of the right to remain silent; it is one factor to be considered. State v. Warmbrun, 277 N.J.Super. 51, 62-64, 648 A.2d 1153 (App. Div.1994), certif. denied, 140 N.J. 277, 658 A.2d 300 (1995).
The defendant in Warmbrun was convicted of reckless manslaughter after striking and killing a pedestrian while driving under the influence of alcohol. Although the defendant refused to sign the proffered waiver form, he "willingly discussed his drinking" that evening. Id. at 64, 648 A.2d 1153. The totality of the circumstances in that case "indicated a knowing and intelligent waiver given defendant's continued discussion of the matter." Ibid. The record here, however, contains no such indication.
"The voluntariness of defendant's waiver is tested by the totality of all the surrounding circumstances." Id. at 62, 648 A.2d 1153. In Warmbrun, the defendant refused to sign a waiver form, but was nonetheless willing to answer questions. Id. at 61, 648 A.2d 1153. In that case, we concluded that defendant, despite refusing to sign the form, had not asserted his right to remain silent. Id. at 64, 648 A.2d 1153.
Here, however, defendant did not merely refuse, repeatedly, to sign the form presented to him. He also explained that he would not sign the form because he did not want to make a statement. Here, in contrast to the procedure that was followed in Hartley, defendant was not initially given the option of crossing out and initialing that portion of the form which indicated a waiver of his rights. 103 N.J. at 258, 511 A.2d 80. And when that option was finally presented to him, he clearly refused it. Defendant was pressed continually by the officers for nearly one-half hour to execute the form and talk to them.
He was told by one of the officers that the form was merely a "silly piece of paper." He was told that signing the waiver form (an action tantamount to relinquishing his right to remain silent) was "just a formality we have." He was repeatedly urged to sign the waiver form on the basis that he was not under arrest for and charged with homicide. The officers told *733 him that the only reason that he had been read his Miranda rights was the fact that he had previously been arrested for a drug-related offense.
Defendant, moreover, on several occasions, explicitly said he did not wish to talk to the officers. After his first refusal to sign the waiver form, one of the detectives said to him, "You want to talk to us though?" Defendant replied, "Uh-uh." That the detectives clearly understood this answer to be a refusal to answer any questions is indicated by the detective's response, "Why not?"
Faced with a clear statement from defendant that he did not wish to answer any questions from the officers, their questioning should have ceased. Johnson, supra, 120 N.J. at 280-82, 576 A.2d 834. And yet the questioning did not cease; rather, it continued for almost one-half hour more until defendant finally relented and signed the form as the detectives had pressed him to do.
Not only did the detectives continue to press defendant to execute the waiver form and to speak to them, they challenged his motives in refusing to accede to their requests. In Hartley, 103 N.J. at 278, 511 A.2d 80, the Supreme Court referred approvingly to Anderson v. Smith, 751 F.2d 96 (2d Cir.1984), which held that it violated a defendant's right to remain silent to ask why he refused to talk.
The interrogator never needs to know why a suspect wants to remain silent; once it is clear that the suspect wants to remain silent, the interrogation should cease. After all, the Fifth Amendment assumes that the suspect invokes his right in order not to be a witness against himself; that is reason enough. An interrogator would only want to probe beyond the suspect's presumed desire to avoid self-incrimination if he expected either to evoke an incriminating response or to get a clue as to how the suspect might be persuaded to abandon his rights.
[Anderson v. Smith, 751 F.2d 96, 105 (2d Cir.1984), overruled on other grds., Maleng v. Cook, 490 U.S. 488, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989).]
We recognize the principle upon which the State relies, that we should defer to the trial court's factual findings underlying the trial court's decision so long as they are "supported by adequate, substantial and credible evidence" in the record. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). We are satisfied that it is inapplicable in the present matter, however, because we have concluded that the trial court's legal analysis was not entirely correct.
Within the course of its extensive oral opinion, the trial court made certain credibility findings after hearing the testimony of the several witnesses. Those credibility findings dealt with the subjective intent of the officers during this entire exchange. Based upon those findings, the trial court concluded that the officers did not intend to mislead defendant, and defendant did not intend to assert his right to remain silent. The trial court concluded that defendant's statement was thus admissible.
The critical question, however, is not whether defendant intended to assert his right to remain silent or whether the officers intended to mislead defendant into waiving his rights. Rather, the critical question is whether defendant's words or conduct could reasonably be viewed as an assertion of his right to remain silent; if they could be, the officers were obligated to cease their questioning or limit their questions solely to clarify that issue. Johnson, supra, 120 N.J. at 283, 576 A.2d 834.
*734 Both the trial court in its oral opinion and the State in its brief on appeal merge together the analyses of two separate questions: did the State "scrupulously honor" defendant's right to remain silent and did defendant make a knowing, voluntary and intelligent waiver of that right? It is only when the first question is answered in the affirmative that it is necessary to deal with the second.
[W]here the right to remain silent is invoked, an inquiry must be made as to the scrupulous honoring of that invocation. . . . It is only if these rights have not been exercised, that the State then has just the "heavy but lesser burden" of demonstrating a knowing, intelligent and voluntary waiver. See State v. Hartley, supra, 103 N.J. at 260-61, 511 A.2d 80; State v. Kennedy, 97 N.J. 278, 286, 478 A.2d 723 (1984). And see Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).
We first consider defendant's invocation of his right to remain silent. Once that has been asserted, it must be "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 102-03, 96 S.Ct. 321, 325-26, 46 L.Ed.2d 313, 320-21 (1975); Miranda v. Arizona, supra, 384 U.S. at 467, 86 S.Ct. at 1624, 16 L.Ed.2d at 719; State v. Johnson, 120 N.J. 263, 282, 576 A.2d 834 (1990); State v. Fuller, 118 N.J. 75, 81, 570 A.2d 429 (1990); State v. Bey (I), 112 N.J. 45, 66, 548 A.2d 846 (1988); State v. Hartley, supra, 103 N.J. at 260-61, 511 A.2d 80; State v. Kennedy, supra, 97 N.J. at 288, 478 A.2d 723. Further, in Hartley, the Supreme Court cautioned that:
[c]are must be taken . . . that there be no blurring of the separate lines of analysis that are followed in respect of the "scrupulously honor" requirement on the one hand and the waiver issue on the other. The distinction between the two concepts stands out in bold relief in this case: given our holding that the failure scrupulously to honor a previously-invoked right to silence renders unconstitutionally compelled any resultant incriminating statement made in response to custodial interrogation, there can be no question of waiver.

[103 N.J. at 261, 511 A.2d 80 (emphasis added).]
[State v. Mallon, 288 N.J.Super. 139, 145-46, 671 A.2d 1115 (App.Div.), certif. denied, 146 N.J. 497, 683 A.2d 200 (1996).]
The answer to the first question, whether the detectives scrupulously honored defendant's right to remain silent, is objective, resting as it does upon a review of the videotape and the transcript; the subjective intent of the participants is immaterial. Thus, the credibility findings of the trial court do not circumscribe our determination of this issue, and it is unnecessary for us to decide whether we concur in the trial court's assertion that the references to defendant's bail and his pending violation of probation merely represented the officers' attempt to assist defendant.
Here, it is apparent to us from our review of the videotape and its accompanying transcript that the detectives did not scrupulously honor the defendant's right to remain silent. Defendant's words and conduct were at the very least ambiguous. Because the right to remain silent is so fundamental, an equivocal assertion of the right to remain silent should "be interpreted in a light most favorable to the defendant." State v. Chew, 150 N.J. 30, 63, 695 A.2d 1301 (1997), cert. denied, 528 U.S. 1052, 120 S.Ct. 593, 145 L.Ed.2d 493 *735 (1999).[2] In that posture, the officers could do no more than to attempt to clarify his position, and could not proceed to their extended attempts to persuade defendant to waive his Miranda rights and agree to speak to them.
We are satisfied the order denying defendant's motion to suppress must be reversed and the matter remanded to the trial court for further proceedings.
Because we have concluded that the trial court's order should be reversed because the detectives did not scrupulously honor defendant's right to remain silent, we deem it unnecessary to address defendant's second argument, in which he contends that the form utilized is unconstitutional per se.
Reversed and remanded for further proceedings in accordance with this opinion.
NOTES
[1] Sharleese and Tracey are defendant's sisters.
[2] In Chew, the Court was considering an equivocal request for counsel. There is no distinction, however, in analyzing the consequences of failing to honor scrupulously an assertion of the right to remain silent and a failure to honor a request for counsel. Hartley, supra, 103 N.J. at 277, 511 A.2d 80. We, therefore, consider it appropriate to view an equivocal assertion of the right to remain silent through the same lens we would employ in considering an equivocal assertion of the right to counsel.