34 A.3d 748

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT AND
CROSS–APPELLANT, v. DEMETRIUS DIAZ–BRIDGES, DE-
FENDANT–APPELLANT AND CROSS–RESPONDENT.

Argued September 12, 2011—Decided January 12, 2012.

546

548

[redacted]

*Joseph E. Krakora,* Public Defender, argued the cause for appellant and cross-respondent.

*John K. McNamara, Jr.,* Assistant Prosecutor, argued the cause for respondent and cross-appellant (*Robert A. Bianchi,* Morris County Prosecutor, attorney; *Mr. McNamara* and *Paula C. Jordao,* Assistant Prosecutor, on the briefs).

*Steven A. Yomtov,* Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (*Paula T. Dow,* Attorney General, attorney).

Justice HOENS delivered the opinion of the Court.

In this appeal we consider whether defendant's request for permission to speak with his mother in the midst of his custodial interrogation was an assertion of his right to silence that required the investigating officers to cease their questioning. The trial court concluded that it was and ordered the suppression of all of the statements made by defendant after that request. The Appellate Division disagreed with that conclusion, but found that defendant did invoke his right to silence during one of his several subsequent reiterations of the request to speak with his mother and ordered the suppression of a lesser portion of his recorded confession.

Because neither defendant's statements about his desire to speak with his mother nor any of his other statements were assertions of his constitutionally-protected right to silence, we

conclude that suppression of any portion of his confession was in error.

## I.

Elizabeth O'Brien's lifeless body was found stuffed inside a closet in her home on the afternoon of January 30, 2008. It was determined that she died from blunt force trauma to her head. Investigators learned that the victim's two sons lived in the home and that they were friends with the defendant Demetrius Diaz–Bridges. They also learned that defendant had been at the victim's home during the evening of January 29, 2008, and into the early morning hours of the day when her body was discovered. Based on the information that they had assembled, the investigators believed that defendant was the last person who had been with the victim before her death.

At the time, defendant was residing a few houses away from the murder scene in a home belonging to his girlfriend's mother. Early in the morning on January 31, 2008, detectives from the Morris County Prosecutor's Office and the Jefferson Township Police Department went there, looking for defendant. They woke him up and asked him to get dressed and accompany them to the Jefferson Township Police Headquarters to discuss O'Brien's murder. Defendant complied with that request, was driven to the police headquarters in the company of three detectives, and was taken to an interview room. After asking defendant some preliminary general questions, the detectives advised defendant of his rights, *see Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966), which he acknowledged he understood and which he waived.

During the interview, which lasted approximately two hours, defendant said nothing that inculpated him in the murder. He did, however, give answers that proved to be at odds with statements he made to the investigating officers during a subsequent interview. He also agreed to submit to a polygraph examination, allowed police to take a sample of his DNA and his fingerprints, agreed to give the clothing he had been wearing on the day of the

murder to the police, and consented to a search of his room. He was then taken back to his residence.

About two hours later, two detectives returned to defendant's residence and asked him if he would come back to police head-quarters for further questioning. Defendant again agreed and accompanied the detectives back to headquarters, where he was again advised of his rights and waived them. He answered the detectives' questions, still making no statements that directly inculpated him in the crime. At the end of the second interview, defendant returned to his residence.

O'Brien's murder remained unsolved after defendant's January 31, 2008, interviews. Several months later, based on information the detectives had learned in their investigation, they decided to speak to defendant about the murder again. On May 1, 2008, they learned that defendant had moved to Raleigh, North Carolina, where he was living with his mother and his stepfather. Detective Evelyn Tasoulas, who was employed by the Morris County Prose-cutor's Office, telephoned defendant's stepfather and explained that she was looking for defendant. Within five minutes, defen-dant called Tasoulas back. Tasoulas told defendant that she wanted to rectify active warrants [1] for him in Morris County. Although she did not mention the O'Brien murder, defendant told her he knew about the warrants and that he was "a little nervous" about "the Jefferson thing." Nevertheless, defendant, who Tasou-las described as being calm, relaxed, and cooperative throughout their ten-minute telephone conversation, agreed to meet in Ra-leigh.

Later that day, Tasoulas, accompanied by Sergeant Stephen Wilson and Detective Supervisor Don Dangler of the Morris County Prosecutor's Office, Morris County Sheriff's Office Detec-tive Mike Curullo, and Jefferson Police Detective James Caruso, drove to North Carolina to meet with defendant. On May 2, 2008,

---

[1] Arrest warrants for defendant had been issued based on his failure to appear for a PTI hearing, failure to comply with a community service requirement, and failure to appear for a violation-of-probation hearing.

they met defendant at mid-morning in a parking lot in Raleigh. Wilson introduced himself, told defendant that he was with the Major Crimes Unit, and explained that he was there to speak to defendant specifically about the O'Brien homicide. After speaking to the detectives for approximately fifteen minutes, defendant agreed to go with them to the Raleigh Police Department Headquarters.

When they arrived at police headquarters, the detectives placed defendant in a room equipped with video and audio recording capabilities. Wilson, Dangler and Caruso conducted the interrogation, which was videotaped and recorded in its entirety.[2] Because of the nature of the analysis undertaken by the trial and appellate courts and the issues raised before this Court, we recount in detail what happened during the nearly ten hours of interview that followed.

At 11:25 a.m., when the questioning started, the detectives advised defendant of his *Miranda* rights, which he acknowledged that he understood and waived. The detectives then reminded defendant that there were outstanding warrants for him in New Jersey in matters unrelated to the O'Brien murder and advised him that he had the right to have a public defender present for any questioning concerning those unresolved matters. Defendant was also told that an attorney had been assigned to represent him in his unrelated Morris County cases and that he had the right to have that attorney present during their interview with him. After acknowledging that he was aware of these rights, defendant waived them as well.

During the first three hours[3] of the interrogation, defendant denied committing the murder. Instead, he gave an account of his

---

[2] Although we utilize the term "videotape" to describe the recording, the interview has been preserved on a series of DVDs that are included in the record on appeal.

[3] The time of day was not recorded on the videotape. Rather, the videotape indicates the elapsed time, beginning at 0.00 when defendant was first placed in

activities on the day of the murder and attempted to divert attention from himself by suggesting that two other young men in the neighborhood were probably the culprits. Eventually, he told the detectives that the victim's son Tyler had committed the murder and had confessed to him. His explanation, all delivered in a tone and with gestures suggesting he was only trying to help the detectives find the killer, was inconsistent with some of his prior statements and with other information about the crime that the detectives had already learned.

Approximately three hours and eleven minutes into the videotape, Wilson told defendant that he did not believe that defendant was telling the truth. Wilson suggested that defendant was "holding back" and that he would "not ... be able to hold it forever." Defendant continued to deny that he was involved in the murder and insisted that he was not holding anything back. For the next twenty-five minutes, the detectives attempted to persuade defendant to reveal information by repeating that they thought he was holding back and that his statements to them were not true. Wilson suggested that it would be a good time for defendant to level with them, telling him that "the truth comes out ... sooner or later it comes out of the darkness and into the light. And now's the time ... It's gonna come out. You still want to hold onto it?" Defendant continued to deny any involvement nonetheless.

After about three and a half hours of elapsed time, Wilson again said that he believed defendant had killed O'Brien. He confronted defendant directly, revealing to him that his earlier interviews had been videotaped and that there were inconsistencies between the answers he had given previously and the ones he was now giving to the investigators. Although shaking his head in denial, defendant leaned over and began to weep. The detectives then tried to

---

the room and continuing throughout the interrogation. As in the Appellate Division's opinion, our references to various points in the interrogation refer to elapsed time on the videotape.

console defendant as they continued to tell him that he would feel better if he told them what happened or explained why it had happened.

About ten minutes passed during which time defendant looked down at the floor and alternated between mumbling, sniffling, crying and rubbing his eyes, while Caruso and Wilson tried to comfort him. At approximately three hours and forty-two minutes of elapsed time, defendant was asked again what happened on the day of the murder. After a momentary pause, defendant said, "Can I just call my mom first?" Wilson then responded by telling defendant that they wanted "to hear first what you have to say because we, you want . . . right now you got to get it off your chest." As defendant continued crying softly, Caruso asked if he wanted to talk to his mother because he was ashamed. For the next few minutes the detectives both consoled him and tried to prompt him to tell them what happened. Apart from several comments not responsive to any questions, defendant cried and sniffled.

At approximately three hours and fifty-one minutes elapsed time, in response to the detectives' further requests that he tell them what had happened, defendant started to confess to the murder. While doing so, he cradled his face in his hands and looked at the floor, and he intermittently sniffled and cried. He described an argument with O'Brien on the day of the crime, during which she became very angry and slapped him three times in his face because he did not have any drugs to give her. He explained that he pushed her away from him, that she fell and struck her head on the edge of a coffee table, that in a panic he then hit her on the back of her head three or four times with an exercise weight, after which he hid her body in the closet. The confession continued for approximately an hour and fifteen minutes.

After defendant confessed, the detectives asked if he wanted anything and offered him a tissue. He responded by saying that he wanted to talk to his mother. Wilson told defendant that they

would arrange a call with his mother, but that they wanted defendant to relax and get his thoughts together. The detectives then took a thirty minute break while Dangler remained with defendant. During the break, defendant again asked if he could speak to his mother, and Dangler replied that they would arrange it. Minutes later, after defendant again asked if he could make that phone call, Dangler left the room, telling defendant that he would ask about the phone.

After the break, the detectives told defendant that they wanted to take a formal statement. Defendant, who was plainly finding it unpleasant to relive the murder, responded by saying "I need a minute ... I gotta ... I hate talking about this shit ... I don't want to talk about it, man." After giving defendant a few moments to compose himself, the detectives again advised defendant of his *Miranda* rights in preparation for taking a formal statement. Defendant again acknowledged that he understood each of his rights and agreed to waive them. When asked if he wanted to speak with the detectives, he responded by saying "Yeah. But I think I need a minute ... I been thinking about this ... Feel real bad." Defendant told the detectives that he felt sick and needed to use the bathroom, at which point they interrupted the interrogation to accommodate that request.

When the interrogation resumed, defendant again began to ask to talk to his mother, repeating his request numerous times during the next three-quarters of an hour. Most significant were his comments to the detectives about the reasons why he wanted to speak with her. In particular, he explained that he wanted to talk to her so that he could "stay calm," that he believed she was the only one who would understand, and that he wanted her to hear what he had done from him rather than from the police. In response to one of these statements, Wilson asked defendant directly, "Do you, do you still wish to talk to us?" and defendant replied by saying: "yes[.] I have no problem talking to you; I just want to talk to my mom. That's it."

As defendant continued to ask to speak with his mother, at approximately six hours and five minutes elapsed time, he again

explained his reason, saying: "I want to hear her say it's gonna be okay. And (inaudible) I don't have nobody. I have nobody. And this thing is gonna do nothing but make it worse. I just want to hear her say it's gonna be all right, that's it." After defendant asked to use a cell phone to call his mother, the detectives took another break, telling him they wanted to give him the chance to "relax" and "get [himself] together."

That break lasted about twenty-five minutes. When the detectives resumed the interview, defendant said "I can't answer no more questions right now, man." Sergeant Wilson then requested that defendant clarify that statement, asking: "Are you saying that you can't answer any more questions or that you don't want to answer any more questions?" Defendant then turned away from the detectives, held his head in his hands, and responded: "I can't right now. I can't answer any questions." Sergeant Wilson then asked defendant if he wanted to take another break and if he still wished to talk to them, to which defendant responded, "I don't have any problem talking, I just need a minute, I just want to . . . talk to my mom."

The detectives decided to take an additional break, offered defendant food and drink, and left the room. While he was alone in the interrogation room at approximately six hours, forty-five minutes elapsed time, defendant began to cry and said "I can't do this shit, man. I just want to go home. . . . I'm so sorry, man." A few minutes later the detectives re-entered the room and allowed defendant to telephone his mother. After the call, the detectives took another break.

When the questioning resumed, defendant indicated that he was having difficulty reliving the experience, "I can't even function . . . can't do nothing . . . I'm trying to not even think about this . . . You don't understand, that shit brings you to so low."

Approximately a half-hour later, defendant regained his composure and began to talk about the murder in detail for a second time. Thereafter the detectives took an hour-long break during

which they provided defendant with food. After that break, defendant again confessed, this time speaking clearly, giving detailed answers to the detectives' questions, and even re-enacting the murder and the way in which he tied up O'Brien's feet and stuffed her body into the closet. After nine hours and fifty-eight minutes, the interrogation ended.

## II.

Defendant moved to suppress all of the statements he made during the January 31, 2008, and May 2, 2008, interrogations. During two days of hearings, the trial court heard testimony presented on behalf of the State from Detectives Mauceri, Wilson and Tasoulas and watched portions of the DVDs of the May 2, 2008 interrogation. Those DVDs were received into evidence and the trial court thereafter reviewed them in their entirety.

For reasons expressed in a written opinion, the trial court denied defendant's motion to suppress the statements made during the two interviews conducted on January 31,[4] but granted the suppression motion, in part, as it related to the May 2, 2008, interrogation. The trial court based its conclusions on what it described as a contrast between defendant's demeanor during the January interviews and that which could be observed during the latter portion of the May 2 interrogation. In making its comparison, the trial court referred only to the videotapes and the DVDs; the court did not rely on any observations of the witnesses who appeared during the suppression hearing nor did it make any findings about the credibility of the investigating officers who had testified.

As the trial court described it,[5] during the January interviews, "defendant was extremely chatty, relaxed and in control of him-

---

[4] The admissibility of the January 31 statements has not been raised before this Court.

[5] The record on appeal does not contain videotapes of the two January interviews.

self." More specifically, the trial court observed that "the defendant's demeanor and the glib rendering of his story would indicate that the defendant wished to cooperate believing that the detectives would accept his version of events and then leave him alone." Likewise, the trial court commented that during the second January 31 interview, defendant "answered questions freely and in a relaxed manner. Clearly he would not have believed he was in custody and the statements that he did make were voluntary and exculpatory."

The trial court's observations of the May 2 interrogation included the court's description of a change in defendant's behavior as the interview progressed. During the first three hours and forty minutes [6] of the May 2 interrogation, defendant was described by the trial court as "once again calm and talkative and voluntarily answering all of the three detectives' repeated questions. There is little question but that he had voluntarily waived his rights, once again hoping to convince his interlocutors that he was innocent of the crime." However, the trial court noted that defendant's demeanor changed after the detectives told him they knew he knew he had murdered O'Brien, describing his behavior as "crying ... great distress ... silence and weeping." The trial court characterized the questioning by detectives as "relentless prodding" and "pressuring" that led to his first request to speak with his mother and that continued after his request to call his mother was not honored. In the trial court's recitation of the events, defendant then "refuse[d] to answer any of the continuing questions" until eventually "capitulat[ing]" and confessing.

Based on those findings, the trial court concluded that as soon as defendant first asked to speak with his mother, the questioning should have ceased because that request "could reasonably be viewed as an assertion of his right to remain silent." In the trial

---

[6] Although the trial court's opinion refers to time of day, it is apparent that the references instead correspond with the elapsed time. We have attempted to use the latter for the sake of clarity.

court's analysis, "it should have been clear to the detectives that he might well have wanted to exercise his right to remain silent." Therefore, the court reasoned that the officers either should have stopped their questioning or should have asked defendant whether his request to call his mother meant that he wanted them to stop. Because the investigators instead continued, the trial court concluded that defendant's rights were violated and his will was overborne. The trial court made additional observations about the interview including descriptions that defendant was "an emotionally broken young man," and "clearly was mentally exhausted," and described "his apparent overwhelming exhaustion and physical distress." Although those phrases were used to describe the trial court's observations of defendant long after his initial request to speak with his mother, they nonetheless formed part of the findings that supported the court's conclusion that defendant's confession was not voluntary. Based on that analysis, the trial court ordered that the entirety of the interview after defendant's first request to call his mother be suppressed.

The Appellate Division, after granting the State's motion for leave to appeal, affirmed the trial court's order suppressing defendant's May 2, 2008, videotaped interrogation only in part. The appellate panel first rejected defendant's argument that he had invoked his right to remain silent when he initially asked to talk to his mother. In large measure, the Appellate Division, based on its independent review of the DVDs of the interview, found that many of the trial court's factual findings could not be supported by the objective evidence in the record. In contrast with the trial court's recitation, the panel, adopting the State's description in part, found that the DVDs "show a calm interrogation during which the detectives spoke to defendant in 'measured tones and treated him courteously.' . . . There is no evidence that defendant was excessively tired, sleep deprived, or physically abused."

Further, the Appellate Division concluded that the trial court erred in analyzing defendant's initial request to speak with his mother "in isolation from the mosaic of the prior relationship

between the detectives and defendant and [apart] from [defendant's] other statements and conduct." The panel reasoned that the initial request, when so evaluated, could not have been reasonably interpreted by the detectives as an invocation of the right to remain silent.

In part, the panel concluded that the trial court's citation to this Court's decision in *State v. Harvey,* 121 *N.J.* 407, 581 *A.*2d 483 (1990), *cert. denied,* 499 *U.S.* 931, 111 *S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991), was misplaced. Instead, because of defendant's willingness to engage in three separate interviews and the absence of any expression by defendant that he had any reluctance to talk to them, the panel concluded that the mere request to speak with a parent could not be interpreted to be an invocation of the right to remain silent in light of more appropriate precedents. *See State v. Roman,* 382 *N.J.Super.* 44, 65, 887 *A.*2d 715 (App.Div.2005) (holding that defendant's request to speak to his parents was not an invocation of the right to remain silent because defendant "never gave the police any indication that he wanted to stop talking," only indicating he wanted "to take a break from the interrogation to speak with his parents"), *appeal dism.,* 189 *N.J.* 420, 915 *A.*2d 1045 (2007); *State v. Brooks,* 309 *N.J.Super.* 43, 57, 706 *A.*2d 757 (App.Div.) (holding that oral and written confessions obtained after defendant asked to speak with his mother were admissible because defendant displayed continuous willingness to cooperate with police), *certif. denied,* 156 *N.J.* 386, 718 *A.*2d 1215 (1998). Using a totality of the circumstances approach, the Appellate Division held that because defendant had been fully cooperative with the detectives throughout their four-month long investigation, the detectives could not have reasonably interpreted defendant's initial request as an invocation of the right to remain silent or as an expression of a pre-condition for further participation in the interview.

Nevertheless, the Appellate Division upheld the trial court's suppression order as it applied to the interrogation beginning at approximately six hours and five minutes of elapsed time. The

panel concluded that several of the statements defendant made beginning at that point were indications that he wanted to remain silent. In particular, the panel relied on his comments that "I want to hear her say it's gonna be okay.... And this thing gonna do nothing but make it worse. I just want to hear her say it's gonna be all right, that's it." The panel characterized that statement as indicating that defendant wanted permission from his mother before continuing, thus constituting at least an ambiguous invocation of the right to remain silent. Moreover, the panel relied on defendant's statement, some thirty-four minutes later, that "I can't do this shit, man. I just want to go home" as a further indication that he was invoking his right to remain silent.

In the Appellate Division's analysis, those statements, when viewed individually or collectively, were sufficiently ambiguous assertions of the right to remain silent that the detectives then were required to stop questioning defendant or were limited to asking questions designed to clarify what defendant meant. Because the detectives failed at that point to stop or clarify, the panel ordered that the May 2, 2008, interrogation be suppressed from approximately six hours and five minutes elapsed time to the end of the videotape.

### III.

Defendant moved, and the State cross-moved, for leave to appeal the Appellate Division's judgment. We granted both motions, 205 *N.J.* 11, 11 *A.*3d 371 (2010), and we thereafter granted leave to the Attorney General to participate as an amicus curiae.

Before this Court, defendant argues that the Appellate Division erred in rejecting the findings and conclusions of the trial court that his initial request to speak with his mother was an invocation of his constitutional right to remain silent. First, he asserts that the panel was obligated to defer to the factual findings of the trial court and that its failure to do so violated the clear directives from this Court, requiring reversal. *See State v. Robinson*, 200 *N.J.* 1, 17, 974 *A.*2d 1057 (2009) (holding that "a trial court's findings

should be disturbed only if they are so clearly mistaken that the interests of justice demand intervention and correction"); *State v. Elders*, 192 *N.J.* 224, 244, 927 *A.*2d 1250 (2007) (noting that availability of videotape does not "extinguish[ ] the deference owed to a trial court's findings").

Second, defendant argues that the Appellate Division erred by distinguishing the precedent from this Court that governs the analysis of a suspect's request to speak with a parent, *see Harvey, supra*, 121 *N.J.* at 419, 581 *A.*2d 483 (noting that defendant sought to terminate interrogation by asking to speak with his father), and by relying instead on appellate level decisions that were inapposite, *see Brooks, supra*, 309 *N.J.Super.* at 57, 706 *A.*2d 757 (noting that defendant who confessed when detectives sought clarification about why he wanted to speak to his mother did so voluntarily); *Roman, supra*, 382 *N.J.Super.* at 66–67, 887 *A.*2d 715 (noting that defendant's confession after he clarified why he wanted to speak to his parents was admissible).

Third, defendant contends that the investigating officers independently violated his constitutional rights when they failed to re-administer *Miranda* warnings to him before resuming questioning after permitting him to converse with his mother. *See State v. Hartley*, 103 *N.J.* 252, 256, 511 *A.*2d 80 (1986) (requiring investigators to re-administer *Miranda* warnings in a renewed attempt to initiate questioning).

The State offers three arguments in support of its assertion that all of defendant's statements were voluntary and therefore admissible. First, the State urges this Court to agree with the Appellate Division's conclusion that defendant's statements prior to the elapsed time of six hours and five minutes of the May 2, 2008, interview were admissible. In particular, the State asserts that the trial court's findings that defendant was suffering from overwhelming exhaustion and physical distress and that the officers engaged in relentless questioning are unsupported by the videotape.

Second, the State argues that there is ample objective evidence that all of defendant's statements were voluntary, pointing out that defendant was aware of his rights, was advised of his rights several times on May 2, is of above-average intelligence, and had been involved previously in the criminal justice system. Acknowledging that defendant was only nineteen at the time, the State contends that he was an adult and was able to understand his rights and to waive them. The State therefore urges this Court to reject defendant's assertion "that the detectives told the defendant that he had no choice but to talk to them," arguing that the detectives merely suggested that defendant would not be free of his own guilty knowledge unless he told them the truth. *See State v. Miller*, 76 *N.J.* 392, 398, 388 *A.*2d 218 (1978) (holding that defendant's statements were admissible even though interviewing officer said, "You've *got* to tell me the truth.").

Third, the State asserts that defendant's behavior, objectively viewed, did not suggest the assertion of the right to remain silent. That is, defendant's weeping during the interview does not equate with unwillingness to speak, but instead is consistent with the fact that he was reliving a heinous crime and recognizing its consequences. The State finds further confirmation for its view because as the interview proceeded, defendant looked and behaved in ways at odds with exhaustion, speaking quickly and firmly and appearing to be quite animated as he re-enacted the murder.

Although agreeing with the Appellate Division's analysis of the first portion of the interview, the State argues that the panel erred by suppressing the statements that defendant made after the six hour and five minute mark of the videotape. Arguing that there was nothing in the comments that defendant made at that point that qualified as even an ambiguous assertion of the right to remain silent, the State contends that the request at that point to speak with his mother and the reason he gave for making that request cannot reasonably have been construed as an invocation of that right. Moreover, the State points out that the statement by defendant that he wanted to go home, which was crucial to the

panel's analysis, was uttered when defendant was alone in the interrogation room.

Amicus Attorney General urges us to conclude that a request to speak with anyone other than an attorney cannot be presumed to be an invocation of the right to remain silent absent additional circumstances known to the interrogating officer that would create the reasonable belief that the request is or may be the assertion of that right. The Attorney General contends that the videotape makes plain that there were no explicit or ambiguous invocations of the right to remain silent and that, when asked, defendant repeatedly stated that he intended to continue speaking with the officers and that he only wanted to speak with his mother to be certain that she would hear of the crime first from him rather than from the police. Arguing that we should apply a totality of the circumstances approach based on the reasonable interpretation of defendant's words and acts, the Attorney General urges us to deem that the entire May 2, 2008, interrogation was voluntary and is admissible at trial.

## IV.

Just last Term, this Court was called upon to consider a challenge to the voluntariness of a confession arising in the context of an assertedly ambiguous invocation of the right to counsel. *State v. Alston*, 204 *N.J.* 614, 10 *A.*3d 880 (2011). The invocation of the right to silence, although analytically similar, now requires our separate attention.

## A.

Unlike the United States Constitution, our Constitution does not explicitly refer to the privilege against self-incrimination. We have, however, recently reiterated that it is a right "so venerated and deeply rooted in this state's common law that it has been deemed unnecessary to include the privilege in our State Constitution." *State v. O'Neill*, 193 *N.J.* 148, 176, 936 *A.*2d 438 (2007). Although our analysis of these rights is informed by Fifth Amend-

ment principles, we have fixed their contours more broadly than those that are applied to the federal counterparts. *Id.* at 176–77, 936 *A.*2d 438.

Significantly, we do not adhere to the bright-line rule that the United States Supreme Court has announced as the standard against which to judge a defendant's invocation of the right to counsel, *see Alston, supra,* 204 *N.J.* at 620–21, 10 *A.*3d 880 (distinguishing *Davis v. United States,* 512 *U.S.* 452, 459–62, 114 *S.Ct.* 2350, 2355–57, 129 *L.Ed.*2d 362, 371–73 (1994)), nor have we adopted such an approach as it relates to the invocation of one's right to silence. Thus, although the United States Supreme Court has recently reiterated that only a clear and unambiguous assertion of the right to remain silent will suffice, *see Berghuis v. Thompkins,* —— *U.S.* ——, 130 *S.Ct.* 2250, 176 *L.Ed.*2d 1098 (2010), we have traditionally utilized, and we continue to employ, a totality of the circumstances approach that focuses on the reasonable interpretation of defendant's words and behaviors.[7]

Consistent with our approach, the inquiry begins with whether the suspect invoked his or her right to remain silent. *See State v. Bey (Bey II ),* 112 *N.J.* 123, 548 *A.*2d 887 (1988) (analyzing whether defendant invoked his right to remain silent as part of evaluating whether his confession was voluntary). If that invocation is clear and unambiguous, we have required that it be scrupulously honored. *State v. Johnson,* 120 *N.J.* 263, 281, 576 *A.*2d 834 (1990) (citing *Michigan v. Mosley,* 423 *U.S.* 96, 96 *S.Ct.* 321, 46 *L.Ed.*2d 313 (1975)). If, however, the invocation is equivocal or ambiguous, leaving the investigating officer "reasonably unsure whether the suspect was asserting that right," *id.* at 283, 576 *A.*2d 834, we have not required that the interrogation immedi-

---

[7] The concern voiced by our dissenting colleagues to the effect that our decision in this matter means that "a suspect will likely have to provide a formulaic response to invoke his rights," *see post* at 573, 34 *A.*3d at 765, overlooks the fact that we have never adopted such an approach. Our totality of the circumstances framework explicitly requires that trial courts consider statements in context.

ately cease, but have instead permitted officers to clarify the otherwise ambiguous words or acts. *Ibid.*

As it relates to the invocation of the right to remain silent, both the words used and the suspect's actions or behaviors form part of the inquiry into whether the investigating officer should have reasonably believed that the right was being asserted. As a result, the court's inquiry necessarily demands a fact-sensitive analysis to discern from the totality of the circumstances whether the officer could have reasonably concluded that the right had been invoked. For this reason, it may be inadequate to confine appellate review to the transcript of the interrogation. Instead, as this appeal demonstrates, if the trial court has based its findings on conduct or behaviors that defendant exhibited during a videotaped interrogation that may be observed and analyzed with equal precision by an appellate court, a review of the videotape of the interrogation is appropriate.

We do not suggest that we have altered our admonition to appellate courts that they give due deference to the fact-finding role of the trial courts. *See State v. Locurto,* 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999) (concluding that reviewing court should defer to factual findings of trial judge as long as they can reasonably be reached on sufficient credible evidence present in the record). Indeed, as we have recently reiterated, if the trial court has had the benefit of and has relied upon testimony of witnesses, appellate courts must give due deference to those findings because it is the trial court that had the opportunity to evaluate the credibility of the witnesses who appeared and testified. *Elders, supra,* 192 *N.J.* at 245, 927 *A.*2d 1250 (observing that trial court based its evaluation on police testimony because patrol car's videotape showed only part of interaction with individuals involved in traffic stop).

However, when the trial court's sole basis for its findings and conclusions is its evaluation of a videotaped interrogation, there is little, if anything, to be gained from deference. In that

circumstance, as we have observed, appellate courts are not confined to a review of a transcript nor obliged to defer to the trial court's findings, but may consider the recording of the event itself. *Alston, supra*, 204 *N.J.* at 626 n. 2, 10 *A.*3d 880 (citing *State v. Harris*, 181 *N.J.* 391, 415–16, 419, 859 *A.*2d 364 (2004)). When the trial court's factual findings are based only on its viewing of a recorded interrogation that is equally available to the appellate court and are not dependent on any testimony uniquely available to the trial court, deference to the trial court's interpretation is not required. Appellate courts need not, and we will not, close our eyes to the evidence that we can observe in the form of the videotaped interrogation itself.

### B.

We have considered whether defendants invoked the right to silence in a variety of contexts, and have established principles that can be summarized without great detail. A suspect who repeatedly responded to questions by saying "I can't talk about it" and who engaged in a persistent pattern of refusal to answer was not "obligat[ed] to state his position more clearly" in order to invoke the right to silence. *Johnson, supra*, 120 *N.J.* at 284, 576 *A.*2d 834. A suspect who told the investigator "I don't believe that I want to make a statement at this time" sufficiently invoked the right to silence that the failure to honor the request required suppression. *Hartley, supra*, 103 *N.J.* at 255–58, 511 *A.*2d 80 (requiring re-administration of *Miranda* warnings during renewed attempt to initiate questioning).

. On the other hand, we deemed a suspect's statement that he wanted an opportunity to "lie down and think about it" before responding, although arguably far less ambiguous a reference to the right to remain silent, to be simply a request for some time and not an assertion that police terminate questioning through the invocation of the right to remain silent. *Bey II, supra*, 112 *N.J.* at 136–37, 548 *A.*2d 887 ("law enforcement officials ... are not obligated to accept any words or conduct, no matter how ambigu-

ous, as a conclusive indication that a suspect desires to terminate questioning"). Similarly, as our Appellate Division has concluded, a suspect who refused eleven separate times to sign a form waiving his rights, which refusal he explained in terms of his desire not to make a statement, has made the desire to invoke the right to silence sufficiently plain that it must be honored. *State v. Burno-Taylor,* 400 *N.J.Super.* 581, 604, 948 A.2d 717 (App.Div. 2008).

We have also considered the analytical implications of requests by an adult to speak with someone other than an attorney, concluding that such requests do not imply or suggest that the individual desires to remain silent. *See, e.g., State v. Martini,* 131 *N.J.* 176, 228–32, 619 A.2d 1208 (1993) (concluding that defendant's request to speak with paramour before "lay[ing] out his entire involvement" was not an invocation of right to remain silent); *State v. Timmendequas,* 161 *N.J.* 515, 616, 737 A.2d 55 (1999) (concluding that request to speak with housemate was not, under the circumstances, invocation of right to remain silent).

■ Our analysis of a request by an adult to speak with a parent has been more nuanced. Although the mere request by an adult to speak with a parent does not equate to an invocation of the right to remain silent,[8] it does necessitate a review of the context in which the request was made. For example, we have considered the surrounding circumstances to include the fact that a suspect had steadfastly refused to engage in any communications with the authorities during the course of three full days in custody for a murder, in determining that his request to speak to a parent prior to responding to police questions was the invocation of a constitutionally-protected right. *Harvey, supra,* 121 *N.J.* at

---

[8] The reasoning of the dissent to the effect that defendant's request to speak with his mother was at least an equivocal invocation of the right to silence because "[a]fter all defendant could not speak to both the officers and his mother at the same time," *post* at 579, 34 A.3d at 769, is not persuasive because it proves too much. Using that logic, a request to speak with anyone would amount to an invocation. We decline to adopt so broad a rule.

419, 581 A.2d 483. In that circumstance, it was not the request to speak with the parent, but that request in the context of other facts that gave rise to the conclusion that the right to silence had been invoked.

Reviewing facts more similar to those now before this Court, the Appellate Division considered the implication of a suspect's request to take a break and speak with his parents, concluding that it did not equate with an invocation of the right to silence. *Roman, supra,* 382 *N.J.Super.* at 66, 887 A.2d 715. There, the Appellate Division, relying on our guidance in *Bey II,* observed that "the police need not accept at face value a defendant's request for a break in the interrogation as an assertion of the right to silence. The police are free to inquire as to the reason for the request." *Ibid.*

The totality of the circumstances approach implicates considerations other than the words used by a suspect, some of which bear upon our analysis of this record as well, including changes in demeanor and emotional responses to questions about a crime. Neither, in isolation, has been or can be considered to be dispositive.

In considering the change in demeanor of a defendant who became "not cooperative . . . somewhat hostile . . . [and] very tense, very agitated" after conversing with his grandmother, we held that "[i]t is not reasonable to construe defendant's behavior as a cutoff of questioning." *State v. Dixon,* 125 *N.J.* 223, 240–42, 593 A.2d 266 (1991). Nor is an emotional reaction to questioning equivalent to an effort to invoke a constitutional right to silence, because we have observed that the recognition by a defendant of the enormity of a crime often provokes an emotional reaction. *See State v. Cook,* 179 *N.J.* 533, 543, 563, 847 A.2d 530 (2004) (reasoning that defendant's emotional reaction seemed to be "more related to the things [the defendant] was admitting than to anything else"). There is no basis on which to conclude, merely because a suspect responds to a question by weeping or moaning, that he or she intends to invoke the right to silence. *Ibid.* The same is true

of other changes in behavior, including crying, sniffling, holding one's head in one's hands, looking away or rubbing one's eyes. Although any of those behaviors forms part of the larger mosaic of the circumstances to be considered, none of them taken alone is a sufficient indication of a decision to invoke the right to silence that the immediate cessation of the interrogation must follow.

As with our analysis of the invocation of the right to counsel, *see Alston, supra*, 204 *N.J.* at 619–25, 10 *A.*3d 880, we adhere to our traditional approach. Although a clear assertion of either right must of course be scrupulously honored, officers confronted with an ambiguous invocation are authorized to make inquiry in order to clarify the suspect's intent. *Id.* at 623, 10 *A.*3d 880 ("when a suspect's words are ambiguous, this Court has permitted police to follow up by asking questions that are designed to clarify the meaning of those words"); *Johnson, supra*, 120 *N.J.* at 283, 576 *A.*2d 834 (observing that if "police are reasonably unsure ... they may ask questions designed to clarify") (citations and quotations omitted); *see Burno–Taylor, supra*, 400 *N.J.Super.* at 607, 948 *A.*2d 717 (noting that police did not attempt to clarify any ambiguity in defendant's words and conduct). Appellate courts considering whether a suspect has invoked or even ambiguously invoked the right to remain silent must consider the totality of the circumstances, including all of the suspect's words and conduct.

C.

Applying these principles to the appeal now before us, we do not discern in any of defendant's requests to speak with his mother an invocation of the right to silence. Unlike *Harvey*, this defendant willingly agreed to speak with the police, meeting with them on multiple occasions and without any coercion to discuss what he knew about the crime. Although he plainly believed that he could divert their focus to one or more other potential suspects, and just as clearly believed, at least for a time, that he had succeeded in doing so, there was nothing involuntary in those

efforts. In fact, when the detective first confronted him with the direct accusation that he was indeed O'Brien's killer, defendant did not waver, insisting that he was not and continuing to try to divert the officers' attention.

Although the videotape makes it equally plain that, when the officer confronted defendant with the inconsistencies in his various stories, his demeanor changed and he looked away and began to weep, one cannot reasonably equate that response with the invocation of any right. Instead, as the entirety of the videotape makes clear, it is but a reflective pause, defendant's effort to collect his thoughts, consider his options, and attempt to keep his emotions in check as he confronted the enormity of what he had done. Nor, in the context of a suspect who never once asked that the interrogators stop or even that they leave him alone, is his request to speak with his mother of constitutional significance. Although the more prudent course, in hindsight, might have been to immediately seek clarification of why defendant wanted to speak with her, nothing in the words that defendant used suggested that he was asking for the questioning to stop or intended to invoke his right to silence.

In fact, when defendant did clarify the reasons for the request, he told the detectives that he did not want his mother to hear what he had done from the police, and wanted the chance to tell her first. He repeatedly told them that he was willing to continue speaking with them, as a result of which his requests to speak with his mother cannot be interpreted to have been a desire to secure her advice about the waiver of his rights or an assertion of silence [9] pending the grant of permission to speak with her. The trial court's findings to the effect that defendant's will was

---

[9] It is for this reason that we reject defendant's argument that the officers were obligated to re-administer his *Miranda* warnings to him after the call to his mother ended and before they continued with their interrogation. Because he had never invoked the right to silence, there was no impediment to the continuation of questioning. *Hartley, supra,* 103 *N.J.* at 256, 511 *A.*2d 80 (holding that fresh *Miranda* warnings are necessary after right to silence has been invoked).

overborne by exhaustion or psychological distress and that the questioning was relentless or unfairly pressured in nature are not supported by the evidence in the record.

 Contrary to the trial court's recitation, the interrogators did not tell defendant that he was required to answer their questions. Although from time to time they used phrases including "you gotta talk to us" or made declarative statements such as "talk to me ... just tell me," we consider as we must the context in which those words were used. *See Alston, supra,* 204 *N.J.* at 626–27, 10 *A.*3d 880 (observing that meaning of vernacular or of colloquial expressions may only be evident from context and tone). None of those statements implied that defendant was required to respond; each was made in conjunction with an entirely permissible effort to persuade defendant that he would feel better, and could get the weight of the guilty knowledge of the crime off of his conscience, by explaining what had happened. Those efforts are not constitutionally infirm. *Miller, supra,* 76 *N.J.* at 398–99, 388 *A.*2d 218; *see State v. Knight,* 183 *N.J.* 449, 462–63, 874 *A.*2d 546 (2005) (holding that lengthy, intermittent interrogation is not inherently coercive and not sufficient in itself to overbear suspect's will); *State v. Galloway,* 133 *N.J.* 631, 654–56, 628 *A.*2d 735 (1993) (upholding validity of confession secured by deliberate act of police deception).

 Moreover, although the appellate panel found that defendant's statement at six hours and five minutes sufficed to invoke the right to silence, there is nothing in those words that differed from defendant's earlier assertions about why he wanted to speak with his mother. The panel apparently concluded that defendant was invoking his right to silence by saying that he wanted to go home and reasoning that those added words gave new content to the continuing request to call his mother. As the videotape itself demonstrates, however, defendant's assertion about wanting to leave was made when he was alone in the interrogation room. There is no ground on which to believe that the detectives were aware of what defendant was saying when they were not in the

room and we do not therefore concur with the Appellate Division's conclusion that defendant invoked his right to remain silent because of the words he spoke at six hours and five minutes of elapsed time.

The United States Constitution, and our long history of interpreting the rights protected by our Constitution, unquestionably establish the privilege against self-incrimination. Our long history of utilizing a totality of the circumstances framework for determining whether a particular defendant has invoked his or her rights and our tradition of avoiding bright-line rules to decide these difficult questions requires careful and searching review of all of the facts and circumstances surrounding any defendant's interrogation.

In this appeal, that review leads us to the inescapable conclusion that defendant's request to speak with his mother, however frequently and fervently repeated, sprang from the very understandable desire to tell her what he had done before she heard it from the police and to hear her words of comfort. Those requests, based on all of the circumstances, did not at any time constitute defendant's invocation of his right to silence.

## V.

The judgment of the Appellate Division directing that a portion of defendant's statement be suppressed is reversed. In all other respects, the judgment of the Appellate Division is affirmed. The matter is remanded to the Law Division for further proceedings consistent with this opinion.

Justice ALBIN, dissenting.

Defendant Demetrius Diaz–Bridges was subject to a classic station-house interrogation, during which he was isolated in a room and questioned by three law enforcement officers over the course of ten hours. The officers read Diaz–Bridges his *Miranda* rights but failed to honor his right to remain silent invoked by his plain and simple request to speak with his mother. Diaz–Bridges

made the request to speak with his mother after more than three hours of interrogation that included repeated pronouncements by the officers expressing their belief that he was lying, that he was guilty, and that he should confess. He made the request to speak with his mother after a lengthy period of silence and uncontrollable sobbing, and after he was an apparently broken man. Logic suggests that had Diaz–Bridges's request to speak with his mother been honored, the officers would have had to break off questioning, at least for the period while he spoke with her. The State conceded at oral argument that had Diaz–Bridges phrased his request in the following form—"Will you stop questioning me until such time as I can speak with my mother?"—the officers would have been obligated to cease the interrogation.

Until today, the protection of the *Miranda* rights did not depend on such linguistic technicalities. Now that the majority has failed to uphold the trial court's suppression of defendant's confession, a suspect will likely have to provide a formulaic response to invoke his rights.

I cannot join the majority opinion because it clashes with our well-established precedent that a suspect need not "express a desire to terminate interrogation with the utmost of legal precision" and that "an equivocal indication of a desire to remain silent ... suffices to invoke *Miranda's* requirement that the interrogation cease." *State v. Johnson,* 120 *N.J.* 263, 281, 576 *A.*2d 834 (1990) (citations and internal quotation marks omitted). I cannot join the majority because there is no prescribed form, no magic words, required for invoking the right to remain silent and because the majority ignores the reality that an anxious, isolated, and legally uneducated suspect subject to the overt and inherent psychological pressures of a police-dominated atmosphere will not speak in the clipped, precise language of a lawyer.

Because I believe that the majority has taken a step backwards from the protections afforded suspects subject to custodial interrogation, I respectfully dissent.

I.

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, *N.J.S.A.* 2A:84A–19, and evidence rule, *N.J.R.E.* 503." [1] *State v. Nyhammer,* 197 *N.J.* 383, 399, 963 *A.*2d 316 (2009). The police are required to provide a suspect with *Miranda* warnings [2] to ensure that he will "have a meaningful opportunity to exercise his right against self-incrimination." *Id.* at 400, 963 *A.*2d 316. The " 'rubber hose' scenario" was not the concern of the *Miranda* decision; rather, it was the modern techniques for breaking the resistance or undermining the will of a suspect. *State v. Hartley,* 103 *N.J.* 252, 262–63, 511 *A.*2d 80 (1986). The purpose of *Miranda* warnings is "[t]o counteract the inherent psychological pressures in a police-dominated atmosphere that might compel a person 'to speak where he would not otherwise do so freely.' " *Nyhammer, supra,* 197 *N.J.* at 400, 963 *A.*2d 316 (quoting *Miranda, supra,* 384 *U.S.* at 467, 86 *S.Ct.* at 1624, 16 *L.Ed.*2d at 719).

We have held that to safeguard the right against self-incrimination " 'a request, "however ambiguous," to terminate questioning ... must be diligently honored.' " *State v. Bey (Bey II),* 112 *N.J.* 123, 142, 548 *A.*2d 887 (1988) (quoting *Hartley, supra,* 103 *N.J.* at 263, 511 *A.*2d 80). Thus, "[a]ny words or conduct that *reasonably* appear to be inconsistent with defendant's willingness to discuss his case with the police are tantamount to an invocation of the

---

[1] *See U.S. Const.* amend. V ("No person ... shall be compelled in any criminal case to be a witness against himself....''); *N.J.S.A.* 2A:84A–19 ("[E]very natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate....").

[2] *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966) held that before a custodial interrogation "the [accused] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 706–07.

privilege against self-incrimination." *Id.* at 136, 548 *A.*2d 887 (emphasis added). The words used by a suspect are not to be viewed in a vacuum, but rather in "the full context in which they were spoken." *State v. Roman,* 382 *N.J.Super.* 44, 64, 887 *A.*2d 715 (App.Div.2005) (citing *State v. Martini,* 131 *N.J.* 176, 231–32, 619 *A.*2d 1208 (1993)).

If the police are unclear whether a suspect has invoked his right to remain silent, two alternatives are presented: (1) terminate the interrogation or (2) ask only those questions necessary to clarify whether the defendant intended to invoke his right to silence. *State v. Johnson,* 120 *N.J.* 263, 281–84, 576 *A.*2d 834 (1990).[3]

We already have held that the request to speak with a parent may be the substantial equivalent of invoking the right to remain silent. In *State v. Harvey,* we found that a defendant invoked his right to remain silent when, after being held for three days in custody, he asked to speak with his father. 121 *N.J.* 407, 418–20, 581 *A.*2d 483 (1990), *cert. denied,* 499 *U.S.* 931, 111 *S.Ct.* 1336, 113 *L.Ed.*2d 268 (1991). We determined that the request for "the chance to consult with a close family member" after three days in custody was qualitatively different from *Bey II, supra,* 112 *N.J.* at 139, 548 *A.*2d 887, in which "the defendant 'requested permission to lay down and to think about what happened,'" (right to remain silent not invoked), and qualitatively similar to *Hartley, supra,* 103 *N.J.* at 258, 511 *A.*2d 80, in which the defendant stated, "I don't believe I want to make a statement at this time," (right to remain silent invoked). *Harvey, supra,* 121 *N.J.* at 419, 581 *A.*2d 483. The majority has strained to distinguish *Harvey* from the facts here, but in the final analysis, there is no meaningful difference between the two cases.

---

[3] Although it is true that police officers "are not obliged to accept any words or conduct, no matter how ambiguous, as a *conclusive* indication that a suspect desires to terminate questioning," *Bey II, supra,* 112 *N.J.* at 136–37, 548 *A.*2d 887 (emphasis added), at a minimum they must seek clarification before proceeding.

Whether a suspect is in custody three hours or three days should not matter in determining whether the police have honored a suspect's right against self-incrimination. In this case, that obligation could have been fulfilled in one of three ways: acceding to defendant's request to speak with his mother, stopping the interrogation, or, at the very least, clarifying whether he was invoking his right to remain silent.

Let us now apply these precedents to the facts before us.

## II.

Defendant was a suspect in the January 29, 2008 murder of Elizabeth O'Brien in Jefferson Township, a municipality in Morris County. After O'Brien's body was discovered the next day, defendant was questioned several times by county and municipal law enforcement officers. Defendant denied guilt in the offense and was not arrested. By May 2, 2008, defendant was living with his mother and step-father in Raleigh, North Carolina.

Because the murder investigation had come to focus on defendant, Morris County Prosecutor's detectives and Jefferson Township police officers traveled to Raleigh to further interrogate defendant. On May 2, defendant voluntarily agreed to accompany the officers to a Raleigh police station to answer questions about the O'Brien murder. Defendant was taken to a windowless interrogation room and seated on one side of a table. Arrayed on the other side of the table were Detectives Dangler and Caruso and Sergeant Wilson. For the first three hours, the three officers calmly questioned defendant, who repeatedly denied committing the murder. The tenor of the questioning, however, changed at approximately three hours and eleven minutes into the interrogation.

At that point, the officers informed defendant that they believed he was lying and that he was holding back the truth. They repeated those accusations for the next seventeen minutes. Although defendant reacted with muted flashes of anger, he continued to maintain his innocence.

At approximately three hours and twenty-eight minutes, the tone of the interrogation took a new turn when the officers directly accused defendant of murdering O'Brien. Sergeant Wilson minced no words, informing defendant, "I know that you killed her." Over the course of the next ten minutes, sometimes talking over one another, all three officers repeatedly told defendant that they *knew* he had killed O'Brien and that he needed to explain why he did it. During this barrage of questioning, defendant slumped forward, cradled his head in one hand, and began to cry. At this point, Detective Caruso squatted down in front of defendant and began rubbing his back.

Over the next several minutes, the officers took a comforting approach, compassionately advising defendant that "[w]e all make mistakes" and prompting him to "get it off [his] chest." During this period while defendant continued to sob, the officers encouraged defendant to confess as Detective Caruso and Sergeant Wilson took turns rubbing his back.

At three hours and forty-two minutes into the interrogation, defendant, while still crying and holding his head in one hand, asked the officers, "Can I just call my mom first?" Sergeant Wilson replied, "We want to hear first what you have to say," and then promised defendant he would get to speak with his mother afterward. Over the next nine minutes, defendant stopped responding and cried uncontrollably, as the three officers, in tandem, provided encouraging words, reassuring him that he was not a "bad person," and that they would "help [him] through this." All the while, Sergeant Wilson and Detective Caruso continued to pat and rub defendant's back. During this time, defendant was not permitted to call his mother, and the officers never attempted to clarify whether the request to speak with his parent meant that he wanted the questioning to stop.

At three hours and fifty-one minutes into the interrogation, defendant began his confession. Over the next hour and twelve minutes, defendant provided a detailed account of the murder. After a twenty-eight minute break, the officers gave defendant fresh *Miranda* warnings, secured a rights waiver, and attempted

to take a formal statement. Defendant complained that he "need[ed] a minute," felt physically ill, and later vomited in the bathroom. Over the next forty-eight minutes, although defendant asked for his mother eight times and did not once answer a question about the murder, the officers neither permitted a call to be made nor halted the interrogation.

Finally, six hours and forty-eight minutes into the interrogation, defendant was permitted to call his mother. Afterwards, the interrogation resumed and defendant ultimately confessed anew. How defendant would have proceeded had he been permitted to speak to his mother before he first confessed, we shall never know. Once defendant incriminated himself, the "cat already was out of the bag"—asserting the right to remain silent would have appeared as an exercise in futility. *See State v. O'Neill*, 193 *N.J.* 148, 171 n. 13, 936 *A.*2d 438 (2007); *see also United States v. Bayer*, 331 *U.S.* 532, 540–41, 67 *S.Ct.* 1394, 1398, 91 *L.Ed.* 1654, 1660 (1947) ("[A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed.").

## III.

Based on its review of the videotape of defendant's interrogation, the trial court concluded that the officers failed to "scrupulously honor" defendant's right to remain silent because even "an equivocal assertion of the right ... should be interpreted in a light most favorable to the defendant." (Quoting *State v. Burno–Taylor*, 400 *N.J.Super.* 581, 607, 948 *A.*2d 717 (App.Div.2008)) (internal quotation marks omitted). In suppressing the entirety of defendant's statement after he requested to speak with his mother, the court reasoned:

> In this case, given the defendant's silence and weeping before he asks to call his mother, his moaning and silence for some time after this request is refused, before he finally capitulates and admits his guilt, it should have been clear to the detectives that he might well have wanted to exercise his right to remain silent. . . .
>
> Instead of treating his request to call his mother as an attempt to exercise his right to stop the questioning as guaranteed by *Miranda*, or at the very least

determining from him if he really wanted to stop talking then, the detectives continue[d] to pressure him to confess, telling them he had to talk to them. The resulting confession cannot be considered a product of the defendant's free will and may not be admitted as evidence against him.

I believe that a *de novo* review of the tape supports those findings. More to the point, the State has failed to meet its burden of proving beyond a reasonable doubt the voluntariness of defendant's confession to the police. *See O'Neill, supra,* 193 *N.J.* at 168 n. 12, 936 *A.*2d 438.

The three officers did not offend defendant's right against self-incrimination by their relentless and extended accusatory questioning of him. But the officers were required to scrupulously honor defendant's constitutional and state common-law right against self-incrimination. The officers failed to do so when they refused to recognize his simple request to speak with his mother as, at least, an equivocal exercise of his right to remain silent. *See Harvey, supra,* 121 *N.J.* at 419, 581 *A.*2d 483. After all, defendant could not speak to both the officers and his mother at the same time. In light of the surrounding circumstances, defendant's request to speak with his mother was a proxy for invoking his right to remain silent.

Before defendant made the request to speak to his mother, for ten minutes, he was uncontrollably sobbing with his head in his hand, and verbally unresponsive. Stopping to clarify whether defendant intended to invoke his right to silence when he asked to speak with his mother would have imposed a minimal burden on the officers. But evidently they were intent on plowing ahead until a confession was extracted. Defendant had to make eight requests to speak with his mother before questioning stopped so he could do so. By then, defendant had incriminated himself and any invocation of the right to remain silent could clearly have been viewed as futile.

The majority makes much of the gory details of the crime involved in this case. However, constitutional rights are not rationed according to the nature of the crime of which a suspect is accused.

*Miranda* was intended to protect the rights of the vulnerable suspect, unversed in the law, isolated in the inherently coercive atmosphere of a police station, and subjected to interrogation techniques designed to undermine his resistance and compel him "to speak where he would not otherwise do so freely." *Miranda, supra,* 384 *U.S.* at 467, 86 *S.Ct.* at 1624, 16 *L.Ed.*2d at 719. Those rights are less secure now. More has been lost in this appeal than Diaz–Bridges's failure to suppress his confession.

For these reasons, I respectfully dissent.

*For affirmance in part/reversal in part/remandment*—Justices HOENS and PATTERSON and Judge WEFING (temporarily assigned)—3.

*Dissenting*—Chief Justice RABNER and Justice ALBIN—2.

*Not Participating*—Justice LONG and LaVECCHIA—2.