**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2497-16T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JERRELL ALEXANDER,

     Defendant-Appellant.

_____

Submitted November 16, 2020 - Decided  February 4, 2021

Before Judges Currier and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 15-06-1396.

Law Offices of John T. Doyle, attorneys for appellant (John T. Doyle, of counsel and on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Stephen A. Pogany, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

    Defendant appeals from his convictions following a jury trial.  We affirm.

I.

We derive our facts from the evidence elicited at trial. In November 2014, defendant and an unidentified man shot and killed Mencea Ryner who was walking with a group of men, including Jaime Walker and Davon Arrington. Surveillance videos taken from cameras in the area showed defendant arriving on the scene on a bicycle carrying a .45 caliber gun with a laser scope which he used to shoot at Ryner four times, striking him in the brain, heart, and body. Ryner was pronounced dead at the scene.

On December 17, 2014, Walker and Arrington were shot by defendant and another man, identified as Jassiem Harper, while they were walking together. Walker was struck five times and died of his injuries on the scene. Arrington was shot in the face, breaking his jaw and several teeth and severing his tongue.

The following day, police arrested defendant for a probation violation.[1] He asked to speak to Essex County Prosecutor's Office (ECPO) detectives about several incidents. After he was read his Miranda[2] rights on December 18, 2014, Detective Murad Muhammad questioned him about his involvement in the November shooting. Defendant gave a statement which was played to the jury

---

[1] Defendant was on probation for a third-degree theft conviction.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-2497-16T4

during the trial. Defendant admitted he had fought with and robbed a man on the night of the November shooting. He also stated he was riding the bicycle that was seen on the surveillance video. Defendant denied shooting Ryner. He stated at different times that Walker and Arrington were the shooters.

As the questioning continued, defendant stated that he possessed a .45 caliber handgun on the night of Ryner's death and he fired several shots towards a porch, "letting off shots in front of" a group of men. He said four or five shots "[p]ossibly" hit Ryner.[3] The interview lasted approximately two and a half hours.

ECPO Detective Rashaan Johnson was the lead detective for the December shooting. He was working with Detective Muhammad and was present when Muhammad interviewed defendant and other witnesses. On December 19, 2014, Johnson interviewed defendant about the December shooting. Defendant admitted he was present but stated Harper fired the shots that struck Walker and Arrington. Defendant denied having a gun during the December shooting. He stated that he ran away after the gunfire. The interview with Johnson lasted approximately two hours.

---

[3] Investigators recovered four shell casings from a .45 caliber handgun at the scene.

## II.

Defendant was charged in an indictment with: conspiracy to commit first-degree murder, N.J.S.A. 2C:5-2 and 2C:11-3(a)(1) to (2) (counts one, five and ten); first-degree murder, N.J.S.A. 2C:11-3(a)(1) to (2) (count two); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count three, seven and nine); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four and eight); first-degree attempted murder, N.J.S.A. 2C:5-1 and 2C:11-3 (count eleven); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count twelve); and first-degree witness tampering, N.J.S.A. 2C:28-5(a)(1) (count thirteen).[4]

Prior to trial, the State moved to admit defendant's statements. Defense counsel opposed the admission, contending defendant had not waived his Miranda rights. After hearing testimony from an ECPO detective, the court

---

[4] An unknown, unindicted co-conspirator was also charged with count one. Harper was charged with first-degree murder, N.J.S.A. 2C:11-3(a)(1) to (2) (count six) along with counts five, seven, eight, nine, ten, and thirteen.
For clarity, counts one and two pertained to Ryner's murder; counts three and four to weapons offenses related to the November shooting; counts five and six to the murder of Walker; counts seven, eight and nine to weapons offenses related to the December shooting; counts ten and eleven to the conspiracy to murder and attempted murder of Arrington; count twelve to the aggravated assault against Arrington; and count thirteen to witness-tampering against Walker and Arrington, the witnesses to the November shooting and victims of the December shooting.

granted the State's motion. In finding the statements admissible, the judge stated:

> [Defendant] appears to be a very intelligent young man to me when I listened to him. He interacted with the police officers in a very professional way. He talked about these inciden[ts] that occurred, and unfortunately, one of his friends was shot and it really bothered him, and he even teared up to some degree while he was discussing all of this; and it really bothered him.[5]
>
> I don't, I don't see this force, I don't see this coercion, I don't see any of this in the record that's before the [c]ourt.
>
> . . . .
>
> I don't see any evidence at all to suggest that he signed, we have -- he doesn't deny this is his signature. You have a right to remain silent; anything can be used against you; you can't afford a lawyer. Then they even said I've been advised; I've read the statements; I understand what my rights are; I'm willing to answer any questions and make a statement. I do not want a lawyer, but understand that I may have one at any time. I also understand that I may stop answering questions at any time.
> This was read to him at least on three occasions. And then one time, he even said I don't want to hear it, and the officer said -- I think it was . . . Detective Johnson -- I got to read it to you anyway.

---

[5] Detective Muhammad noted defendant was crying as he discussed Ryner's death in the first interview.

And he sat there and no promises or threats have been made to me, and no [pressure] . . . of any kind has been used against me.

. . . .

I mean, this is one of those cases where it's kind of, unless I hear something differently, it's kind of laid out almost as well as it could be. We have signed waivers; we have a recorded statement on a CD; we have your client not denying that he didn't sign it. We have an officer who was there, present at both instances.

And I think the standard is beyond a reasonable doubt because of a statement. And quite candidly, I don't have any reasonable doubt, nothing to . . . make me not believe that this defendant knew what he was doing.

He was, I watched him, you know. And I know there was some cross-examination about keep your head up.[6] But in this [c]ourt's opinion, listening to him discuss and to talk about all of this, it didn't suggest to the [c]ourt that he was under the influence, and certainly that he was under the influence on the 18th. He certainly didn't come back on the 19th and was still under the influence a day later, he was in custody for a whole 24 hours or so before he came back the next day and gave another statement and executed the same paperwork.

I just don't see it.

. . . .

---

[6]   At the <u>Miranda</u> hearing, defense counsel questioned the detective whether defendant could have been under the influence of any foreign substance at the time of the interviews, noting Detective Johnson's request to defendant to pick his head up during the second interview.

I'm convinced that this is an admissible statement. As to some of the nuances, as to whether or not everything is completely admissible, we can discuss that later at another date.

But I'm going to allow this statement if this case proceeds to trial to be admissible against this defendant, because I believe he knew what he was doing. I believe it was a knowing and willing statement. . . . I do, I find that it's going to be admissible.

The trial took place over a twelve-day period from September 13 to October 7, 2016. Defendant was convicted on counts one, two, three, four, and seven, and acquitted of all other counts. Defendant was sentenced to an aggregate forty-eight-year prison term with an eighty-five percent parole disqualifier.

### III.

On appeal, defendant presents the following issues for our consideration:

> I. DEFENDANT'S DECEMBER 14, AND 18, 2014 STATEMENTS WERE THE PRODUCT OF PSYCHOLOGICAL COERCION AND WERE NOT THE PRODUCT OF A VOLUNTARY, KNOWING AND INTELLIGENT WAIVER OF HIS RIGHT TO REMAIN SILENT AND THEREFORE SHOULD HAVE BEEN SUPPRESSED BY THE TRIAL COURT
>
> II. DEFENDANT DID NOT RECEIVE ADEQUATE LEGAL REPRESENTATION FROM TRIAL COUNSEL AS A RESULT OF COUNSEL'S FAILURE TO ASK THE JURY TO CONSIDER THE

LESSER INCLUDED CHARGES OF AGGRAVATED MANSLAUGHTER, AND MANSLAUGHTER WHERE THERE WAS A RATIONAL VIEW OF THE EVIDENCE THAT SUPPORTED A CONVICTION FOR THE LESSER INCLUDED OFFENSES AND NOT THE GREATER OFFENSE

III. DEFENDANT'S SIXTH AMENDMENT RIGHT TO CONFRONT THE WITNESSES AGAINST HIM WAS VIOLATED BECAUSE THE STATE DID NOT MAKE ADEQUATE EFFORTS TO PROCURE THE IN-COURT TESTIMONY OF WITNESS DAVON ARRINGTON AND INSTEAD INTRODUCED HIS STATEMENTS AT TRIAL THROUGH THE TESTIMONY OF DETECTIVE JOHNSON

A.

Defendant argues the trial court erred in admitting his December 18 and 19, 2014 statements to police because the State failed to prove beyond a reasonable doubt that he knowingly, intelligently, and voluntarily waived his Miranda rights. He contends his Miranda waivers were invalidated by "the repetitive and pro[longed] nature of the interviews" which caused defendant to experience "corresponding mental exhaustion . . . ." In addition, defendant asserts that his request to speak to his mother during the first interview while he was signing the Miranda waiver constituted an invocation of his right to remain silent.

A-2497-16T4

We "engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights" when assessing the propriety of a trial judge's decision to admit a police-obtained statement. State v. Hreha, 217 N.J. 368, 381-82 (2014) (quoting State v. Pickles, 46 N.J. 542, 577 (1966)). In performing our review, we defer to the trial judge's credibility and factual findings because of the judge's ability to see and hear the witnesses, and thereby obtain the intangible but crucial "feel" of the case. State v. Maltese, 222 N.J. 525, 543 (2015) (quoting Hreha, 217 N.J. at 382). To warrant reversal, a defendant must show the admission of the statement was error "capable of producing an unjust result." Ibid. (quoting R. 2:10-2). In our review of the denial of a suppression motion, we defer to the trial judge's findings so long as they are "supported by sufficient credible evidence . . . ." State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Gamble, 218 N.J. 412, 424 (2014)). We will not reverse a trial court's findings of fact based on its review of a recording of a custodial interrogation unless the findings are clearly erroneous or mistaken. Id. at 381.

"A suspect's waiver of his [or her] Fifth Amendment right to silence is valid only if made 'voluntarily, knowingly and intelligently.'" State v. Adams, 127 N.J. 438, 447 (1992) (quoting Miranda, 384 U.S. at 444). The State bears

A-2497-16T4

the burden of establishing beyond a reasonable doubt that a confession is knowing and voluntary. R. 104(c); State v. Nyhammer, 197 N.J. 383, 401 n.9 (2009).

The determination of the voluntariness of a custodial statement requires an assessment of the "totality of all the surrounding circumstances" related to the giving of the statement. State v. Roach, 146 N.J. 208, 227 (1996) (citations omitted). In reviewing the totality of circumstances, the court considers the following factors: a suspect's age, education, intelligence, prior contacts with the criminal justice system, length of detention, advisement of constitutional rights, the nature of the questioning, and whether physical punishment or mental exhaustion were involved in the interrogation process. State ex rel. A.S., 203 N.J. 131, 146 (2010) (quoting State v. Presha, 163 N.J. 304, 313 (2000)).

If a defendant's invocation of his or her right to silence is clear and unambiguous, it must be "scrupulously honored." S.S., 229 N.J. at 384 (quoting State v. Johnson, 120 N.J. 263, 282 (1990)). If the invocation is ambiguous, officers are permitted to clarify the defendant's ambiguous words or acts. Id. at 382-83 (citing Johnson, 120 N.J. at 283-84). The trial court must make a fact-sensitive inquiry whether, under the totality of the circumstances, the officers could have "reasonably" concluded that the defendant's "words or conduct . . .

[were] inconsistent with [his or her] willingness to discuss [the] case with the police . . . ." Id. at 382 (quoting State v. Bey, 112 N.J. 123, 136 (1988)).

A request made by an adult prior to or during police questioning to speak with someone other than an attorney generally does "not imply or suggest that the individual desires to remain silent." State v. Diaz-Bridges, 208 N.J. 544, 567 (2011). In Diaz-Bridges, the defendant, an adult suspect in a homicide, was advised of his Miranda rights and interrogated for more than three hours by police, without making any admissions, before he began weeping and asked: "'Can I just call my mom first?'" 208 N.J. at 552-53. Detectives did not honor the request, instead continuing the interrogation despite the defendant's repeated requests to call his mother. Id. at 553-54. After six hours and forty-five minutes, the police permitted the defendant to call his mother. Id. at 554-55.

The Supreme Court held that, by itself, an adult's request to speak with a parent "does not equate to an invocation of the right to remain silent . . . ." Id. at 567. The Court did "not discern in any of defendant's requests to speak with his mother an invocation of the right to silence[,]" reasoning further that because the defendant "never once asked that the interrogators stop or even that they leave him alone," his repeated requests to speak to his mother were of no "constitutional significance." Id. at 569-70; see, e.g., State v. Martini, 131 N.J.

11

176, 233 (1993) (finding no invocation of the right to silence where the defendant requested to speak to his co-defendant girlfriend to tell her that he planned to cooperate with police).

In other cases, this court has considered whether a suspect's request to speak to a friend or family member before answering any questions may be an implicit invocation of the right to remain silent. See, e.g., State v. Roman, 382 N.J. Super. 44, 65 (App. Div. 2005) (finding no invocation where the defendant requested to speak to his parents to take a break from the interrogation); State v. Brooks, 309 N.J. Super. 43, 57 (App. Div. 1998) (finding no invocation where the defendant failed to indicate that he wanted to speak to his mother to obtain her advice); see also State v. Faucette, 439 N.J. Super. 241, 262 (App. Div. 2015) (finding no invocation where the defendant's request for his mother's presence during interrogation "suggest[ed] a desire for support"). Cf. Maltese, 222 N.J. at 546 (holding a twenty-year-old defendant invoked his right to remain silent when he "unequivocally" indicated more than ten times that he wanted to obtain his uncle's advice before answering any further questions); State v. Harvey, 121 N.J. 407, 417, 420 (1990) (finding the defendant invoked his right to silence when he stated "he would tell [the officers] about the murder" after he spoke with his father to obtain his advice).

12

Here, the record demonstrates defendant was properly advised of his Miranda rights and his waiver of those rights was made knowingly and intelligently. The trial court correctly held the State had proven defendant's statements were made freely and voluntarily. At no time during the questioning on either date did defendant indicate he wanted to revoke his consent, consult with an attorney, or terminate the interview.

At the time of both statements, defendant was twenty years old, had completed some high school education, had a prior conviction for theft, and was arrested for a violation of probation prior to questioning. He was familiar with the criminal justice system. The interviews were conducted on different days; each lasting approximately two hours. Defendant responded clearly and intelligently to the questions. The detectives did not exert any physical punishment, mental exhaustion, or otherwise cajole defendant into giving a statement. We are satisfied his statements to the police were freely given, and the detectives did not mislead him.

In addition, under the totality of the circumstances, defendant's unclear request to speak to his mother in the first interview was not an ambiguous invocation of the right to remain silent. Defendant did not indicate an unwillingness to speak to the detectives unless and until he spoke to his mother.

A-2497-16T4

Cf. Roman, 382 N.J. Super. at 65-66. He did not state he wished to obtain his mother's advice or support. See Diaz-Bridges, 208 N.J. at 570; Faucette, 439 N.J. Super. at 261; Brooks, 309 N.J. Super. at 56.

The judge's findings are supported by sufficient credible evidence in the record. We see no reason to disturb the determination to admit the statements.

B.

Defendant contends that his trial counsel was ineffective in failing to request jury instructions on either reckless or aggravated manslaughter as lesser-included offenses of murder. Defendant submits that his actions during the November shooting – firing his weapon at unidentified individuals near Ryner – were only reckless because he did not intend to kill Ryner.

"[C]ourts have expressed a general policy against entertaining ineffective-assistance-of-counsel claims on direct appeal because such claims involve allegations and evidence that lie outside the trial record." State v. Preciose, 129 N.J. 451, 460 (1992). However, when the trial itself provides an adequately developed record upon which to evaluate defendant's claims, appellate courts may consider the issue on direct appeal. State v. Allah, 170 N.J. 269, 285 (2002).

The standard for determining whether trial counsel's performance was ineffective for purposes of the Sixth Amendment was formulated in Strickland v. Washington, 466 U.S. 668, 687 (1984) and adopted by the New Jersey Supreme Court in State v. Fritz, 105 N.J. 42, 58 (1987).

To prevail on a claim of ineffective assistance of counsel, defendant must meet the two-pronged test establishing both that: (1) counsel's performance was deficient and he or she made errors that were so egregious that counsel was not functioning effectively as guaranteed by the Sixth Amendment to the United States Constitution; and (2) the defect in performance prejudiced defendant's right to a fair trial such that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 687, 694.

Here, defendant did not request the court to instruct the jury on reckless or aggravated manslaughter as lesser-included offenses. When an error has not been brought to the trial court's attention, we will not reverse on the ground of such error unless the error is "clearly capable of producing an unjust result." R. 2:10-2. "When a party does not object to a jury instruction, this court reviews the instruction for plain error." State v. Montalvo, 229 N.J. 300, 320 (2017) (citing R. 1:7-2; State v. Wakefield, 190 N.J. 397, 472-73 (2007)).

15

Even if there is no request by a party to charge the jury on a lesser-included offense, a trial court has an independent, non-delegable duty to instruct a jury on such a charge "when the facts adduced at trial clearly indicate that a jury could convict on the lesser while acquitting on the greater offense." State v. Jenkins, 178 N.J. 347, 361 (2004) (citations omitted).

A defendant commits murder when he or she "purposely causes death or serious bodily injury resulting in death[,]" or "knowingly causes death or serious bodily injury resulting in death . . . ." N.J.S.A. 2C:11-3(a)(1) and (2).

In contrast, a defendant commits aggravated manslaughter when he or she "recklessly causes death under circumstances manifesting extreme indifference to human life[.]" N.J.S.A. 2C:11-4(a)(1). "Aggravated manslaughter is a lesser-included offense of murder." State v. Galicia, 210 N.J. 364, 400 (2012) (citation omitted).

Reckless manslaughter is a lesser-included offense of aggravated manslaughter. State v. Ruiz, 399 N.J. Super. 86, 97 (App. Div. 2008) (citing State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994)). A defendant commits reckless manslaughter when he or she consciously disregards a substantial and unjustifiable risk that death will result from his or her conduct. N.J.S.A. 2C:11-4(b)(1); N.J.S.A. 2C:2-2(b)(3). "The risk must be of such a

16

nature and degree that . . . its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation." N.J.S.A. 2C:2-2(b)(3). The degree of risk for recklessness must be more than "a mere possibility of death." State v. Curtis, 195 N.J. Super. 354, 364 (App. Div. 1984).

Our Supreme Court has found no rational basis to charge the jury on lesser-included offenses to murder where a defendant shoots a victim several times directed at vital organs. See, e.g., State v. Harris, 141 N.J. 525, 550-51 (1995) (finding no rational basis to charge passion/provocation manslaughter when the defendant fired a single shot into the victim's back and neck at close range while the victim was laying on ground); State v. Biegenwald, 126 N.J. 1, 18 (1991) (finding no rational basis to charge aggravated manslaughter when the defendant shot the victim four times in the head at close range); State v. Hightower, 120 N.J. 378, 413 (1990) (finding no rational basis to charge aggravated manslaughter when the defendant shot the victim three times, including one shot to the brain, at close range); State v. Rose, 120 N.J. 61, 64 (1990) (finding no rational basis to charge aggravated manslaughter when the defendant fired a sawed-off shotgun into the victim's abdomen at point-blank range); see also State v. Hammond, 338 N.J. Super. 330, 337-39 (App. Div.

2001) (finding no rational basis to charge reckless manslaughter when, after beating the victim, the defendant shot the victim five times at close range); see also, e.g., State v. Mendez, 252 N.J. Super. 155, 160-62 (App. Div. 1991) (finding no rational basis to charge reckless manslaughter where the defendant fired a machine gun into a crowd because he knew it was practically certain that his conduct would cause death or serious injury).

Under the facts presented here, defendant has failed to demonstrate trial counsel was ineffective under the Strickland-Fritz test because the record lacks credible evidence to support either manslaughter charge. The evidence suggests only that defendant acted intentionally and knowingly rather than with mere recklessness or under circumstances manifesting extreme indifference to human life. Witness statements, surveillance video, ballistics analysis and defendant's statements all rationally support no finding other than defendant acted deliberately and intentionally in causing Ryner's death. The jury heard that defendant approached Ryner while riding a bicycle and, using a laser scope, shot him once. Defendant then got off the bicycle, drew his weapon, stood over Ryner and discharged several shots directly at his head and body while Ryner lay on the ground. Several bullets pierced Ryner's brain, heart, and lungs.

Considering those facts, there was no basis for defense counsel to request or for the court to charge the jury with a lesser-included offense. There were no grounds on which the jury could rationally conclude defendant did not either purposely or knowingly kill Ryner and acquit defendant of murder and convict him of reckless or aggravated manslaughter. Defendant cannot demonstrate plain error or that the request for such instructions would have changed the outcome of the case. We are satisfied the record does not support an ineffective assistance of counsel claim for trial counsel's failure to request a lesser-included charge.

C.

Defendant claims his confrontation rights were violated by the State's failure to present Arrington as a trial witness and the trial court's admission of Detective Johnson's impermissible hearsay testimony regarding Arrington's statements to police that implicated defendant in the December shooting.

We review the trial court's evidentiary rulings for a mistaken exercise of discretion. State v. Green, 236 N.J. 71, 81 (2018) (citing State v. Rose, 206 N.J. 141, 157 (2011)). A trial court's evidentiary ruling will not be reversed unless it "is so wide of the mark that a manifest denial of justice resulted." State v.

J.A.C., 210 N.J. 281, 295 (2012) (quoting State v. Brown, 170 N.J. 138, 147 (2001)).

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const., amend. VI. The text of the New Jersey Constitution contains identical language. N.J. Const., art. I, ¶ 10; State v. Kent, 391 N.J. Super. 352, 375 (App. Div. 2007). The clause has been construed to prohibit "the admission of '[t]estimonial statements of witnesses absent from trial' except 'where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.'" State v. Rehmann, 419 N.J. Super. 451, 454-55 (App. Div. 2011) (alteration in original) (quoting Crawford v. Washington, 541 U.S. 36, 59 (2004)).

During her cross-examination of Detective Johnson, defense counsel elicited testimony that Johnson had obtained three statements from Arrington regarding the November and December shootings. Defendant introduced the transcripts of the statements into evidence and questioned Johnson about them. Arrington did not identify defendant or either of the shooters in the November murder of Ryner.

During a break in proceedings, the prosecutor advised the court that he did not object to defendant introducing Arrington's statements during Johnson's cross-examination, even though "quite a substantial part of Detective Johnson's testimony was the hearsay of Davon Arrington." The prosecutor explained that he was "having some issues getting [] Arrington to court." He stated he had informed defense counsel that Arrington was not in New Jersey and he did not mind having Arrington's statements being introduced through the detective's testimony.

The prosecutor stated he wanted the court to know that normally he would have objected to Arrington's statements being introduced through Johnson but because of the difficulty he was having in producing Arrington as a witness, he did not object in order to "giv[e] some favor to the defense to allow [some] parts of [Arrington's statements] to come in."

On redirect examination of Johnson, the State sought to introduce other portions of Arrington's statements. Johnson testified that during his statement regarding the December shooting, Arrington identified defendant as the person who shot him and also identified Harper as being present.

Defense counsel then objected to the prosecutor's line of questioning regarding a specific line in the transcript in which Arrington said he was afraid

of defendant.  Counsel stated the question was beyond the scope of her cross-examination and she did not open the door to permit the State to introduce other portions of Arrington's statements during its redirect.  The trial judge disagreed, stating counsel's cross-examination questioned why Arrington initially did not identify defendant.

Defense counsel responded that she only referred to portions of the statement in which Arrington stated defendant did not shoot him.  The court again disagreed, noting that defense counsel questioned Johnson about Arrington's statements regarding both the November and December shootings.  The court found that the defense opened the door to permit the State to question Johnson about Arrington's statements on both shootings.  The court overruled defendant's objection, stating: "I think the door was blown wide open on . . . this area and I think the State, in fairness, needs to go into it."

After a subsequent N.J.R.E. 104 hearing to determine whether Arrington was "unavailable," the trial judge declined to give a Clawans[7] charge or to grant a mistrial.  The prosecutor stated that Arrington was in New Jersey in 2015 but he had later moved to Texas.  The State was unsuccessful in communicating with Arrington after his move.

---

[7]  State v. Clawans, 38 N.J. 162 (1962).

The trial judge found Arrington was never subpoenaed and was not in prison but his whereabouts were otherwise unknown. In addition, Arrington was not a suspect so the State could not compel him to remain in the State. It was also unclear whether there was a scheduled trial date when Arrington left New Jersey, so there was no date for him to appear. Moreover, Arrington was a victim and his testimony directly implicated defendant, therefore he was a material witness and his testimony would have been favorable to the State.

In discussing the mistrial motion, defense counsel agreed her questioning of Johnson went beyond the State's direct examination. The court found counsel made a strategic decision to introduce portions of Arrington's statement that exculpated defendant. However, in doing so, defense counsel opened the door for the State to bring in other portions of the statements. Defense counsel also advised that the prosecutor repeatedly told her, in private, off-the-record conversations, that he "anticipate[d]" calling Arrington as a trial witness but to "treat [Arrington] as if he's not coming . . . ." The judge replied that he did not know of any rule that obligated the State to advise counsel whether or not a witness was going to testify.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of

23                                                                    A-2497-16T4

the matter asserted." State v. Brown, 236 N.J. 497, 522 (2019) (citing R. 801(c)). Hearsay may not be admitted into evidence unless it falls within one of the exceptions provided by the rules of evidence or "other law." R. 802.

"The 'opening the door' doctrine is essentially a rule of expanded relevancy and authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) admissible evidence that generates an issue, or (2) inadmissible evidence admitted by the court over objection." State v. James, 144 N.J. 538, 554 (1996) (emphasis omitted). The doctrine "allows a party to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use of related evidence." Ibid. (citation omitted).

Similarly, the doctrine of "curative admissibility" provides that "'when inadmissible evidence has been allowed, when that evidence was prejudicial, and when the proffered testimony would counter that prejudice,' the opposing party thereafter 'may introduce otherwise inadmissible evidence to rebut or explain the prior evidence.'" State v. Vandeweaghe, 177 N.J. 229, 238 (2003) (quoting James, 144 N.J. at 555).

Our Supreme Court has emphasized that the opening the door and curative admissibility doctrines can be used only "to prevent prejudice" and may not "be

subverted into a rule for [the] injection of prejudice." James, 144 N.J. at 556 (quoting United States v. Winston, 447 F.2d 1236, 1240 (D.C. Cir. 1971)). "Introduction of otherwise inadmissible evidence under the shield of [those] doctrine[s] is permitted 'only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.'" Ibid. (quoting California Ins. Co. v. Allen, 235 F.2d 178, 180 (5th Cir.1956)).

Similarly, under the invited error doctrine, a defendant cannot "pursue a strategy of allowing a substitute witness to testify—hopefully to his advantage—and then when the strategy does not work out as planned, cry foul and win a new trial." State v. Williams, 219 N.J. 89, 101 (2014); see State v. Santamaria, 236 N.J. 390, 409 (2019) (quoting State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974)) ("Trial errors which were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal.").

Here, defense counsel stated she thought the State intended to call Arrington as a trial witness, despite the prosecutor's statement that Arrington should be treated as an unavailable witness. Despite the prosecutor advising that Arrington would not testify in court right before Johnson's testimony, defense counsel did not request a Rule 104 hearing to determine the

A-2497-16T4

admissibility of Arrington's statements and the State's efforts in attempting to procure Arrington's trial testimony.

Knowing Arrington had identified defendant as the shooter, defense counsel made a strategic decision during Johnson's cross-examination to introduce Arrington's statements to challenge Arrington's credibility and to suggest that a different person committed the crimes. The prosecutor did not question Johnson about Arrington's statements during his direct examination. Only after the defense introduced the statements on cross-examination did the prosecutor seek to introduce other portions of the statements during redirect examination. Finally, defense counsel conceded to the trial court that the introduction of Arrington's statements on cross-examination was outside the scope of the State's direct examination.

Although Johnson's testimony was indisputably impermissible hearsay testimony, the defense introduced it, opening the door for the State to introduce other portions of Arrington's statements. See Williams, 219 N.J. at 101; Vandeweaghe, 177 N.J. at 238; James, 144 N.J. at 554. In addition, defense counsel extensively cross-examined Johnson about his investigation and Arrington's statements.

Even if the admission of this testimony was error, it had no capacity to produce an unjust result. See R. 2:10-2. There was substantial evidence against defendant in addition to Arrington's identification, including surveillance video that captured the November shooting; defendant's confession to police that he shot at Ryner four times with a .45 caliber weapon, and was riding a bicycle during the November shooting; defendant's confession to police that he was present during the December shooting and his identification of the weapons used; and ballistics evidence revealed Ryner was fatally shot with several .45-caliber projectiles and Walker was fatally shot with one of the weapons described in defendant's confession.

Any remaining arguments not addressed lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION